In the Matter of: APPLICATION OF DEPARTMENT OF ARCHIVES AND HISTORY FOR CERTIFICATE OF PUBLIC CONVENIENCE AND NECESSITY FOR RESTORATION OF TRYON'S PALACE, NEW BERN, NORTH CAROLINA.

(Filed 7 June, 1957.)

1. **Eminent Domain § 6—Department of Archives and History, upon certificate of public convenience, has power to condemn land for restoration of Tryon's Palace.**

Chapter 543, Session Laws of 1955, granted the Department of Archives and History the power to acquire real estate and personal property of statewide historical significance by gift or purchase, etc., and the power of condemnation for such purpose with the approval of the Governor and Council of State, and also substituted the Department of Archives and History for the Department of Conservation and Development in Chapter 791, Session Laws of 1945, so as to empower the Department of Archives and History under the 1945 Act, after obtaining a certificate of public convenience and necessity, to condemn land for the restoration of Tryon's Palace without the approval of the Governor and Council of State.

2. **Abatement and Revival § 3—Abatement of subsequent action does not apply when prior action, as constituted, cannot be prosecuted further.**

The principle of abatement of a second action on the ground of a prior action pending between the parties is a rule of convenience to prevent multiplicity of suits, and therefore the principle can have no application where the power of eminent domain is given one agency of the State, which institutes condemnation proceedings thereunder, and later this power is withdrawn from such agency and given to another, which institutes identical proceedings, since the prior proceeding, as constituted, cannot be prosecuted further, and the second petition may be treated as a motion in the cause to substitute the name of the successor State agency for that of the first.

3. **Constitutional Law § 8a—**

The restoration of the first fixed capital of the Colony of North Carolina is a public purpose for which the General Assembly may grant the power

of eminent domain, and provide for the payment of the necessary property out of funds available therefor.

**4. Utilities Commission § 5—**

The determination by the Utilities Commission of an application for a certificate of public convenience and necessity is presumed valid and will not be disturbed unless it is made to appear that it is clearly unreasonable and unjust.

RODMAN, J., took no part in the consideration or decision of this case.
PARKER, J., concurring.

APPEAL by protestants from *Morris, J.,* November, 1956 Term, CRAVEN Superior Court.

This proceeding originated before the North Carolina Utilities Commission upon the petition of the State Department of Archives and History, hereinafter called the applicant, for a certificate of public convenience and necessity to the end that lands necessary to the restoration of Tryon's Palace in New Bern, Craven County, North Carolina, may be acquired by condemnation, as contemplated by Chapter 791, Session Laws of 1945, and Acts amendatory thereof. Notice of the proceeding was duly served upon the owners of the lands sought to be condemned. In response to the notice, the landowners, hereinafter called the respondents, filed a special appearance and motion to dismiss the proceeding for that (1) The North Carolina Utilities Commission is without authority to grant the certificate, (2) that the restoration of Tryon's Palace is not a public purpose, (3) that an application was already pending in which the North Carolina Department of Conservation and Development sought to obtain a certificate for identically the same purpose, (4) the pendency of the prior application worked an abatement of the present application, (5) that the legislative enactments under which the applicants seek the restoration of Tryon's Palace are unconstitutional, (6) that the Governor and Council of State had not approved the application.

The Utilities Commission, after full hearing and upon competent evidence, made findings in favor of the petitioners and issued the certificate. The respondents filed exceptions to the findings of fact and to the refusal of the Utilities Commission to declare the proceeding abated. The respondents appealed to the Superior Court of Craven County.

Upon the hearing in the Superior Court, Judge Morris overruled all exceptions and objections, confirmed all findings of the Utilities Commission, and approved the order granting the certificate. The respondents excepted and appealed.

*George B. Patton, Attorney General, and John Hill Paylor, Assistant Attorney General.*

*Henry A. Grady, Jr., W. J. Lansche, Jr., for the State of North Carolina ex rel. N. C. Utilities Comm. and the Dept. of Archives and History, appellees.*

*Barden, Stith & McCotter, R. E. Whitehurst, John Beaman, and Jones, Reed & Griffin for protestants, appellants.*

HIGGINS, J. Chapter 791, Session Laws of 1945, authorized the Department of Conservation and Development to accept gifts, to acquire property, and to restore Tryon's Palace in New Bern. The Act gives to the Department of Conservation and Development authority to acquire by purchase or condemnation "such areas of land in New Bern . . . as it may find necessary for the restoration of said Palace." . . . And condemnation must be in accordance with Chapter 40, General Statutes of North Carolina, "including the provisions of the Public Works Eminent Domain Law." The original Act was amended by Chapter 233, Session Laws of 1949; by Chapter 649, Session Laws of 1951; by Chapter 1100, Session Laws of 1953.

Under the authority of the foregoing Acts, the Department of Conservation and Development, on 4 November, 1954, filed an application before the North Carolina Utilities Commission for a certificate of public convenience and necessity and the right to institute condemnation proceedings to acquire so much of the land described in the original Act of 1945 as the Department had been unable to acquire by purchase. Notice was served on the landowners who entered a special appearance and moved to dismiss the proceeding upon the grounds hereinbefore set forth.

While the application for the certificate was pending before the Utilities Commission, the General Assembly enacted Chapter 543, Session Laws of 1955, giving the State Department of Archives and History power to acquire real estate and personal property of statewide historical significance by gift, purchase, devise, or bequest, and when found to be important for State ownership the Department (Archives and History) after receiving the approval of the Governor and Council of State, shall have power to acquire by condemnation. (See Sec. 121-8.)

Chapter 791, Session Laws of 1945, was amended "by substituting the words 'Department of Archives and History' wherever the words 'Department of Conservation and Development' appear in the Act." Authority to condemn is not being exercised under the Acts of 1955 but under the original Act of 1945 and amendments thereto. The result is the Department of Archives and History has the power specifically conferred on it by the terms of Chapter 543, Session Laws of 1955.

---

---

The power to acquire by condemnation "historic and archaeological properties" under the Act of 1955 applies to such properties generally. The power can be exercised only with the approval of the Governor and the Council of State. It also has by substitution the powers originally given to the Department of Conservation and Development by the Act of 1945 and the amendments. The power to acquire by condemnation applies only "to such areas" as may be necessary to restore Tryon's Palace and it must be exercised as provided in the Public Works Eminent Domain Law. A certificate of public convenience and necessity is required. *Utilities Comm. v. Story*, 241 N.C. 103, 84 S.E. 2d 386; *In re Housing Authority*, 233 N.C. 649, 65 S.E. 2d 761. Approval of the Governor and Council of State is not required.

At the time the Department of Archives and History applied for the certificate of public convenience and necessity, an application on behalf of its predecessor (Department of Conservation and Development) was then pending before the North Carolina Utilities Commission. Whether the application now before us be treated as a motion in the cause substituting Archives and History for Conservation and Development, or as a new application made necessary by withdrawal of authority from Conservation and Development, is immaterial. There was a full hearing on the present application in which the respondents fully participated and the proceeding appears to be regular in all aspects. It is the only one in which a judgment can be rendered against the respondents. "As a general rule, this right to plead the pendency of another action between the same parties, before judgment had, is regarded to a large extent as a rule of convenience, resting in the principle embodied in the maxim *nemo debet bis vexare*—no one should be twice harassed for the same cause." *Allen v. McDowell*, 236 N.C. 373, 72 S.E. 2d 746; *Reed v. Mortgage Co.*, 207 N.C. 27, 175 S.E. 834; *Cook v. Cook*, 159 N.C. 46, 74 S.E. 639. Abatement of the second action is based on the theory that all the issues can be settled in the first action. In this case the Act of 1955 withdraws authority to maintain the proceeding from the Department of Conservation and Development and gives it to the present petitioner. The present petition and notice may be treated as a motion in the cause substituting as the petitioner the Department of Archives and History in lieu of the Department of Conservation and Development. *Beck v. Voncannon*, 237 N.C. 707, 75 S.E. 2d 895; *In re Cranford*, 231 N.C. 91, 56 S.E. 2d 35; *Simmons v. Simmons*, 228 N.C. 233, 45 S.E. 2d 124; *Craddock v. Brinkley*, 177 N.C. 125, 98 S.E. 280.

The Legislature has declared the restoration of Tryon's Palace a public purpose. The North Carolina Utilities Commission, upon a proper petition and after notice and hearing, has granted a certificate of public convenience and necessity. Upon appeal, Judge Morris has

overruled all exceptions and confirmed the Commission's order.   The
State has funds available to pay for the respondents' property which
by the proper authorities has been found necessary for the purpose of
restoring the palace.   It was the first fixed capital of the Colony of
North Carolina, and its most notable and unusual architectural achieve-
ment.   The power of the Legislature to provide for the restoration is
beyond question.   *Greensboro v. Smith,* 239 N.C. 138, 79 S.E. 2d 486;
*Jamison v. Charlotte,* 239 N.C. 423, 79 S.E. 2d 797.

This cause came to the Superior Court and from that court here upon
appeal from a determination of the Utilities Commission.   The deter-
mination is presumed to be valid and is not to be disturbed unless it is
made to appear that it is clearly unreasonable and unjust.   *Utilities
Commission v. The Great Southern Trucking Co.;* 223 N.C. 687, 28 S.E.
2d 201.   The record fails to disclose any valid reason in law why the
judgment of the Superior Court should be disturbed.

Affirmed.

Rodman, J., took no part in the consideration or decision of this case.

Parker, J., concurring:   The building called Tryon's Palace was "the
most elegant structure in America."   Marshall DeLancey Haywood's
"Governor William Tryon," p. 193.   It was not, however, simply a
residence for the Royal Governor, but also served as a capitol or state
house—containing a hall where the Assembly met, a council-chamber,
and public offices.

John Hawks, who came to America with Governor Tryon, superin-
tended its construction.   It was built of brick and trimmed with marble.
Skilled artisans were brought from Philadelphia to do the work.   The
plumbing was done by an expert who came over from England for the
express purpose.   The main building was three stories high.   On each
side was a two-storied building, connected with the central building by
gracefully curving galleries.   In front of the Palace was a handsome
courtyard.   The rear of the building was fashioned in the style of the
Lord Mayor's Residence in London.   All the sashes and four of the
mantel pieces were imported.   In the council-chamber there was a
chimney-piece containing decorations of Ionic statuary, with columns
of sienna, the fretwork on the frieze being inlaid with the latter mate-
rial.   There were richly ornamented marble tablets on which were
medallions of King George and his Queen.

The work of this noble structure was begun on 26 August 1767.   In
1770 the house was ready for occupancy, and the public records were
moved into it in January and February of the following year.

The opening of the Palace was celebrated by a grand ball.   Of this
entertainment we can catch a vivid glimpse through the clouds of old

night in the correspondence between James Iredell and Sir Nathaniel Dukenfield, wherein the baronet writes how the dignified councillor, Samuel Cornell, "hopped a reel" at the close of the evening. McRee's "Life and Correspondence of James Iredell," Vol. I, p. 173. Little could those present on that festive occasion foresee that in less than two decades this Palace would be a mass of charred ruins.

Francois Xavier Martin, an early historian of the State, tells that he visited the Palace in company with the noted Venezuelan patriot, Don Francisco de Miranda, who said the building had no equal in South America.

This stately building and grounds, when completely restored, will whisper to countless generations of North Carolinians and others from the four ends of the earth:

> "Tales of a brave and warlike race,
> Of peace and strife, of death and life,
> Of word and action bold.
> It will tell of men long gone,
> Of long forgotten ways;
> And how our fathers wrought and fought
> In old colonial days."

Quoted with slight variations from Marshall DeLancey Haywood's poem in the dedication of his book, Governor Tryon, To the Memory of the Revolutionary Patriots of North Carolina.

Verse and legend and story have told of

> "The stately homes of England
> How beautiful they stand!
> Amidst their tall ancestral trees,
> O'er all the pleasant land."

Many of these stately homes are being preserved by the English Government at public expense as a glorious memorial of the past, and millions who speak the English tongue will visit, now, and in the future, the land of their ancestors to see them. The princely benefaction of the Rockefellers in restoring Williamsburg has made universal the fame of the great Virginians of Colonial and Revolutionary Days.

When Tryon's Palace is completely restored by State aid and the generous gifts of citizens of the State, and when countless thousands in the years that are ahead gaze upon the stately building, and stand in the hall where the Assembly met, and where in immediate Pre-Revolutionary and Revolutionary Times patriotic North Carolinians debated and decided upon the principles that lie at the foundation of

our constitutional rights as free men, they will stand in the presence of history as those great men live again, and will thrill with pride over how their fathers wrought and won for them their liberties "in old colonial days." And each North Carolinian can say with great satisfaction, "this is my own, my native land."

I completely agree with the statement in the Court's opinion that the restoration of Tryon's Palace serves a public purpose. I concur in the result.