STATE OF NORTH CAROLINA EX REL NORTH CAROLINA UTILITIES COMMISSION v. WESTCO TELEPHONE COMPANY.

(Filed 4 February, 1966.)

**1. Utilities Commission § 6—**

Expert opinion testimony as to the fair value of a utility's property on the date in question in a sum slightly in excess of replacement costs, exclusive of costs of construction in progress, materials and supplies, *held* properly considered by the Commission in determining the fair market value of the property of the utility in use and useful in rendering service to its customers.

**2. Same—**

In arriving at the fair value of a public utility's property used and useful in providing service to its customers, the Utility Commission is charged with the duty of taking into consideration the requirements set forth in the statute as well as other relevant facts, G.S. 62-133, and when its determination of the fair value of the utility's property is ascertained with due consideration of such factors and is supported by substantial, competent and material evidence, the value as ascertained by it will be sustained.

**3. Same—**

The low interest rate charged a telephone company on a loan by the REA is properly taken into consideration in figuring the operating costs of such utility, since such low interest rate is granted for the purpose of making it possible to extend telephone services to areas which, in all probability, would not be served otherwise, and the Commission owes the duty to be fair to the public as well as to the utility.

**4. Same—**

The Utilities Commission and not the courts has the duty and power to establish rates for public utilities.

**5. Same—**

The fixing by the Utilities Commission, in the exercise of its discretion, of a rate return of 3.8 per cent upon the predetermined value of a utility's property on the date in question will be upheld, there being no evidence of capricious, unreasonable or arbitrary action or disregard of law on the part of the Commission in arriving at such rate.

LAKE, J., took no part in the consideration or decision of this case.

APPEAL by defendant from *Copeland, S.J.,* 16 August 1965 Civil Session of WAKE.

Westco Telephone Company (Westco) filed an application with the North Carolina Utilities Commission (Commission) on 27 February 1964 for a rate increase, requesting authority to put into effect new rates on residential and business telephones ranging from 44% to 147% higher than the approved rates in effect prior to 11 March 1964, and from 10% to 92% higher than the rates approved by the Commission in an order in the proceedings, designated as docket No. P-58, Sub 37 (P-58, Sub 37), signed 11 March 1964, effective 1 April 1964.

Westco is a wholly owned subsidiary of Western Carolina Telephone Company (Western), having been incorporated on 5 July 1960, for the purpose of spinning off 10 of Western's 17 exchanges as a separately incorporated company, in order to secure a loan from the Rural Electrification Authority (REA) at an interest rate of 2%. Westco began operations on 1 June 1962 with the transfer of the telephone exchanges in the following towns from Western:

| | |
|---|---|
| Bakersville, N. C. | Marshall, N. C. |
| Burnsville, N. C. | Mars Hill, N. C. |
| Fontana, N. C. | Murphy, N. C. |
| Hayesville, N. C. | Robbinsville, N. C. |
| Hot Springs, N. C. | Clayton, Georgia |

The 9 North Carolina exchanges comprised a total of 4,975 tele-

phone stations in service. During 1962 Westco placed into service new exchanges at the following points:

Micaville, N. C.                                   Sevier, N. C.
Garden City, N. C.                                Dillard, Georgia
Glenwood Providence, N. C.

Beginning on 1 June 1962 the company commenced a major plant construction program from funds borrowed from REA, and by 31 December 1963 was serving 13 exchanges in North Carolina and 2 in Georgia, with 7,234 total stations in North Carolina, an increase of 45.4%. The North Carolina main stations averaged 80% of the total of Westco's main stations.

During the test period 1 January 1963 through 31 December 1963, the company had operating revenues of $723,915, including $115,209 of rate increases collected under bond. The average revenue per main station was $120.89. Without the bonded increase it would have been $101.65. Applying the increase in P-58, Sub 37, the revenue was $114.08 per station. The company's operating expenses during the test period, excluding depreciation and taxes, were $279,533, being $46.68 per average station. After all expenses, including depreciation, taxes, interest and other fixed charges, the company enjoyed final net income for 1963 of $86,884.

After the refunds required under P-58, Sub 37, the final net income available to stockholders after all charges for 1963, including a book charge for Federal taxes of $19,458 which was not actually paid or owed, was $40,773.

During the test period, according to the Commission's findings, the company earned a rate of return per company books of 4.54% including the bonded rate increase. After the refunds under P-58, Sub 37, the actual rate of return will be 4.01% without the normalization of investment tax credits, or 3.45% after normalization. After the refund under P-58, Sub 37, the return on equity will be 9.80% before normalization of the tax credit, or 6.64% after normalization.

Westco had under construction for the calendar year 1964 a continuation of the major plant construction program to increase net plant from $3,929,100 at 31 December 1963 to $6,007,120 at 31 December 1964, an increase of plant of 52.9% during 1964. This is an increase in stations in service from 7,234 to 9,784, or 35.3% increase in stations.

The rate increases proposed in the application would produce $240,504 of additional revenue over the rates approved prior to 11 March 1964, and $160,343 over the approved increase in P-58, Sub 37, allowed 11 March 1964.

The financial structure of Westco as of 31 December 1963 was as follows:

|                              |             | Percent |
|------------------------------|-------------|---------|
| REA 2% Loan                  | $4,224,946  | 85%     |
| Common Stock                 | 608,430)    |         |
| Unappropriated Earned Surplus | 155,538)   | 15%     |

The rates for Westco's North Carolina exchanges have been increased substantially in P-58, Sub 37, signed 11 March 1964, effective 1 April 1964, plus further increases applied for here, whereas the exchanges located in Georgia have not received any increases since 1953, and were lower for a comparable size exchange than the North Carolina rates from 1953 to 1960. Westco has never applied for a rate increase on its Georgia exchanges although an application in an undisclosed amount is proposed in the near future.

On 13 August 1964, the Commission issued its order allowing rate increases amounting to approximately $39,000 additional revenue, being an average increase of 5% over the previous rates fixed in the rate increase allowed in P-58, Sub 37, effective 1 April 1964. This increase amounted to approximately 24% of the $160,000 increase in revenue applied for by Westco. The order prescribed new rate schedules and rate groupings based on the number of main stations and Private Branch Exchange (PBX) trunks in the respective exchanges.

There is no dispute about the depreciated value of Westco's property dedicated to the rendering of service to the public on 31 December 1963 as being $3,929,101; to this figure, applicant contends, should be added plant under construction in the sum of $221,-326, and materials and supplies in the sum of $48,662, a total of $4,-199,089.

The Commission found that the fair value of applicant's property used and useful in providing the service rendered to the public within the State of North Carolina, considering the reasonable original cost of the properties, less those portions of the cost which have been consumed by previous use recovered by depreciation expense, the replacement or reproduction cost of the properties, and other factors relevant to the fair value of the properties, as of 31 December 1963, was $4,120,000.

From this order Westco appealed direct to the Supreme Court under G.S. 62-99. The Supreme Court held that the statute granting direct appeal was unconstitutional and dismissed the appeal, with the right of the appellant to file the appeal in the Superior Court of Wake County within 60 days, which the appellant did.

*State ex rel Utilities Commission v. Westco Telephone Company,*
264 N.C. 423, 142 S.E. 2d 13. The Superior Court affirmed the order
of the Commission by judgment entered 19 August 1965, and Westco
appeals, assigning error.

*Edward B. Hipp for the Commission.*
*Attorney General Bruton, Asst. Attorney General Charles D.*
*Barham, Jr., for the State.*
*Van Winkle, Walton, Buck & Wall by Herbert L. Hyde for*
*Westco.*

DENNY, C.J.  The questions posed for determination on this
appeal are as follows:  (1)  Did the court below err in affirming the
finding and conclusion of the Commission that the fair value of the
property of Westco used and useful in rendering service to the public
as of 31 December 1963, was $4,120,000?  (2)  Did the court com-
mit error in affirming the finding and conclusion of the Commission
that a fair and reasonable rate of return was 3.8%, and that such
rate would produce $156,560 in net operating income?

Ordinarily the fair value of a utility's property is found to be
less than the reconstruction cost of the property. In this case, how-
ever, Mr. Russell, of the American Appraisal Company, who was
tendered by Westco as an expert witness, testified, "(b)ased on the
studies which I have conducted and conditions described, it is my
opinion that the fair value of the company's property as of Decem-
ber 31, 1963, is $4,140,000." However, he testified that the replace-
ment cost new, less depreciation, of the Westco property in service
as of 31 December 1963, was $4,137,568. Although the witness stated
that his fair value figure did not include construction cost in progress,
and materials and supplies, it was permissible for the Commission
to take into consideration this opinion of fair value in excess of re-
placement cost when it determined the fair value of Westco's prop-
erty used and useful in rendering service to be $4,120,000 on 31
December 1963. On the other hand, the president of Westco testified
that the net original cost of applicant's property in North Carolina,
used and useful in furnishing telephone service to the public as of
31 December 1963, was $4,199,088; that this figure included plant
under construction in the sum of $221,325, and materials and sup-
plies in the sum of $48,662. Even so, he testified that in his opinion
the fair value of Westco's plant, used and useful in rendering tele-
phone service to the public as of 31 December 1963, was at least
$4,407,555.

G.S. 62-133 reads as follows:

"(a)   In fixing the rates for any public utility subject to the provisions of this chapter, other than motor carriers, the Commission shall fix such rates as shall be fair both to the public utility and to the consumer.

"(b)   In fixing such rates, the Commission shall:

"(1)   Ascertain the fair value of the public utility's property used and useful in providing the service rendered to the public within this State, considering the reasonable original cost of the property less that portion of the cost which has been consumed by previous use, recovered by depreciation expense, the replacement cost of the property, and any other factors relevant to the present fair value of the property. Replacement cost may be determined by trending such reasonable depreciated cost to current cost levels, or by any other reasonable method.

"(2)   Estimate such public utility's revenue under the present and proposed rates.

"(3)   Ascertain such public utility's reasonable operating expenses, including actual investment currently consumed through reasonable actual depreciation.

"(4)   Fix such rate of return on the fair value of the property as will enable the public utility by sound management to produce a fair profit for its stockholders, considering changing economic conditions and other factors, as they then exist, to maintain its facilities and services in accordance with the reasonable requirements of its customers in the territory covered by its franchise, and to compete in the market for capital funds on terms which are reasonable and which are fair to its customers and to its existing investors.

"(5)   Fix such rates to be charged by the public utility as will earn in addition to reasonable operating expenses ascertained pursuant to paragraph (3) of this subsection the rate of return fixed pursuant to paragraph (4) on the fair value of the public utility's property ascertained pursuant to paragraph (1).

"(c)   The public utility's property and its fair value shall be determined as of the end of the test period used in the hearing and the probable future revenues and expenses shall be based on the plant and equipment in operation at that time.

"(d)   The Commission shall consider all other material facts of record that will enable it to determine what are reasonable and just rates.

"(e)   The fixing of a rate of return shall not bar the fixing of a different rate of return in a subsequent proceeding."

In arriving at the fair value of a public utility's property used and useful in providing the service rendered to its customers, the Commission is charged with the duty to consider the requirements set forth in G.S. 62-133, as well as other relevant factors. It will be noted that in fixing the value of Westco's property at $4,120,000 as of 31 December 1963, it was fixed at $190,899 above the original cost less depreciation. Moreover, the Commission is required under G.S. 62-133(c) to determine the fair value of the utility's property as of the end of the trial period based on the plant and equipment in operation at that time. In our opinion, the value fixed by the Commission is supported by substantial, competent and material evidence and should be sustained, and it is so ordered.

On the second question, we think what was said in *Utilities Commission v. State* and *Utilities Commission v. Telegraph Co.*, 239 N.C. 333, 80 S.E. 2d 133, is applicable. Barnhill, J., later C.J., in speaking for the Court, said:

"Necessarily, what is a 'just and reasonable' rate which will produce a fair return on the investment depends on (1) the value of the investment—usually referred to in rate-making cases as the Rate Base—which earns the return; (2) the gross income received by the applicant from its authorized operations; (3) the amount to be deducted for operating expenses, which must include the amount of capital investment currently consumed in rendering the service; and (4) what rate constitutes a just and reasonable rate of return on the predetermined Rate Base. When these essential ultimate facts are established by findings of the Commission, the amount of additional gross revenue required to produce the desired net return becomes a mere matter of calculation. Due to changing economic conditions and other factors, the rate of return so fixed is not exact. Necessarily, it is nothing more than an estimate.

"In finding these essential, ultimate facts, the Commission must consider all the factors particularized in the statute and 'all other facts that will enable it to determine what are reasonable and just rates, charges and tariffs.' G.S. 62-124 (superseded by G.S. 62-133). It must then arrive at its own independent conclusion, without reference to any specific formula, as to (1) what constitutes a fair value, for rate-making purposes, of applicant's investment used in rendering intrastate service—the Rate Base, and (2) what rate of return on the predetermined Rate Base will constitute a rate that is just and reasonable both to the applicant and to the public. While both original cost and replacement value are to be considered, neither constitutes a proper Rate Base."

According to the evidence in the hearing before the Commission and the findings of the Commission, Westco received an increase in rates under the order entered in P-58, Sub 37, 11 March 1964, effective 1 April 1964, that would produce an increase in annual gross revenue of $80,318, while the order entered by the Commission on 13 August 1963, effective 1 September 1964, further increased the gross annual income in the amount of $39,936. Consequently, these increases in 1964 amounted to $120,254. Therefore, based on the estimated revenues and operating expenses made by the Commission as required by G.S. 62-133(b)(2) and (3), a rate of return of 3.8% would produce a net operating income of $156,560. This sum, according to finding of fact No. 17, will produce a return on the equity investment of 11.74%, which is sufficient to pay an annual dividend of 8% on Westco's capital stock and leave approximately 50% of its net earnings as surplus.

The Commission dealt only with the North Carolina properties of Westco which approximate 80% of Westco's holdings. Approximately 80% of the investment in Westco in North Carolina and Georgia is represented by a loan from REA at an annual interest rate of 2%. The appellant assails the rate of return as fixed by the Commission at 3.8% as being unresaonably low. We realize the area served by Westco is largely a mountainous area and not as densely populated as most areas of the State. Even so, the low interest rate granted by the REA to electric cooperatives and companies like Westco is for the purpose of making it possible to extend electric power service and telephone service to areas which in all probability would not be served otherwise. The Commission must consider its duty to the public as well as to the utility. The area served by Westco would seem to be developing rather satisfactorily since, at the end of 1963, Westco had 7,234 total telephone stations in North Carolina, an increase of 45.4% over the 4,975 telephones at the time of the spin-off from Western. Moreover, according to Westco's evidence, its plans at the time of the hearing before the Commission called for the expansion of its system in North Carolina by the end of 1964 to serve 9,784 telephone stations, an increase of 35.3%.

When Westco put into operation the additional telephones, such service carried the increased rates established by the two orders entered by the Commission in 1964.

The General Assembly has delegated to the Commission, and not to the courts, the duty and power to establish rates for public utilities. *Utilities Commission v. Champion Papers, Inc.,* 259 N.C. 449, 130 S.E. 2d 890. Furthermore, under the provisions of G.S. 62-94(e), upon appeal, rates fixed by the Commission shall be deemed

*prima facie* just and reasonable. *Utilities Commission v. R. R.*, 249 N.C. 477, 107 S.E. 2d 681; *Utilities Commission v. Casey*, 245 N.C. 297, 96 S.E. 2d 8; *Utilities Commission v. Municipal Corporations*, 243 N.C. 193, 90 S.E. 2d 519; *Utilities Commission v. Trucking Co.*, 223 N.C. 687, 28 S.E. 2d 201. Moreover, since we find no evidence of capricious, unreasonable, or arbitrary action, or disregard of the law, the discretionary power of the Commission, in fixing the rate of return at 3.8% on the predetermined value of Westco's property as of 31 December 1963, will be upheld. *Utilities Commission v. McLean*, 227 N.C. 679, 44 S.E. 2d 210; *In re Department of Archives & History*, 246 N.C. 392, 98 S.E. 2d 487.

If it develops that the rate fixed on the predetermined fair value of Westco's property as of 31 December 1963 is not a fair and just rate of return either to Westco or to its customers, the Commission may, upon a proper petition, establish a different rate of return. G.S. 62-133(e).

The judgment of the court below is
Affirmed.

LAKE, J., took no part in the consideration or decision of this case.