STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION AND ROBERT MORGAN, ATTORNEY GENERAL v. GENERAL TELEPHONE COMPANY OF THE SOUTHEAST AND CITY OF DURHAM

No. 5

(Filed 16 June 1972)

1. Telephone and Telegraph Companies § 1; Utilities Commission § 6— rate base — value of franchise

While the value of a telephone franchise enters into and affects the market price of the utility's stock, it does not enter into the computation of the utility's rate base. G.S. 62-133.

2. Telephone and Telegraph Companies § 1; Utilities Commission § 6— adequacy of service — rates

The Utilities Commission, not the Supreme Court or the Court of Appeals, has been given the authority to determine the adequacy of a public utility's service and the rates to be charged therefor. G.S. 62-31; G.S. 62-32; G.S. 62-130; G.S. 62-131.

3. Telephone and Telegraph Companies § 1; Utilities Commission § 6— public utility rates — legislative function — constitutional limitations

In fixing rates to be charged by a public utility, the Utilities Commission is exercising a function of the legislative branch of the government and may not exceed the limitations imposed upon the Legislature by the State and Federal Constitutions.

4. Telephone and Telegraph Companies § 1; Utilities Commission § 6— public utility rates — statutory requirements

In fixing the rates to be charged by a public utility for its service, the Utilities Commission does not have the full power of the Legislature but must comply with the requirements of G.S. Chapter 62, more specifically, G.S. 62-133.

5. Telephone and Telegraph Companies § 1; Utilities Commission § 6— public utility rates — power of reviewing court

The authority of an appellate court to reverse or modify the order of the Utilities Commission, or to remand the matter to the Commission for further proceedings, is limited to that specified in G.S. 62-94, which includes the authority to reverse or modify such order on the ground that it violates a constitutional provision.

6. Telephone and Telegraph Companies § 1; Utilities Commission § 6— public utility rates — presumption of reasonableness

Upon appeal, the rates fixed by the Utilities Commission, pursuant to G.S. Chapter 62, are deemed *prima facie* just and reasonable, and all findings of fact supported by competent, material and substantial evidence are conclusive.

Utilities Comm. v. Telephone Co.

7. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— findings of fact — appellate review**

A finding of fact or determination of what rates are reasonable by the Utilities Commission may not be reversed or modified by the reviewing court merely because the court would have reached a different finding or determination upon the evidence.

8. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— public utility — acquisition of property — board of directors**

Except as otherwise provided, expressly or by reasonable implication in G.S. Chapter 62, a public utility is free to manage its property and business as it sees fit, and the Utilities Commission may not restrict or control the discretion of the utility's board of directors in the acquisition of property or in the price paid for it.

9. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— public utility rates — attraction of capital**

To attract capital, a public utility need not charge, and is not entitled to charge, for its services rates which will make its stock or bonds attractive to investors who are willing to risk substantial loss of principal in return for the possibility of abnormally high earnings, since the utility, having a legal monopoly in an essential service, offers its investors a minimal risk of loss of principal.

10. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— public utility rates — fair value**

The Utilities Commission must "ascertain the fair value of the public utility's property used and useful in providing the service," and must then fix a fair rate of return on "fair value."

11. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— fair value**

The "fair value" which G.S. 62-133 requires the Utilities Commission to ascertain is not the price for which the property could be sold as used or second-hand property, is not the sale or exchange value of the entire business as a going concern, and is not the same as the fair value to be awarded by a jury in a condemnation case.

12. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— fair value**

G.S. 62-133 contemplates that, normally, the Utilities Commission will ascertain the "fair value" of a utility's properties at a point somewhere between the original cost, less depreciation, and the cost of replacement new, less depreciation.

13. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— fair value — original cost — replacement cost**

In determining "fair value," the Utilities Commission has the duty to weigh evidence of original cost, less depreciation, and evidence of replacement cost, less depreciation, fairly in balanced scales and may not disregard either or brush aside either by giving it only minimal consideration.

14. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— fair value — appellate review**

The reviewing court may not set aside the Utilities Commission's determination of fair value merely because the court would have given the respective elements thereof different weights and would, therefore, have arrived at a different fair value.

15. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— fair value — "other facts"— necessity for findings**

"Other facts" which the Utilities Commission considers in determining the fair value of a utility's properties must be found and set forth in its order, so that the reviewing court may see what these elements are and determine the authority of the Commission to consider them as relevant to the present fair value.

16. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— rate base — excess of fair value over cost — addition to equity**

G.S. 62-133 contemplates that the excess of fair value over the original cost, less depreciation, shall be included in the rate base of the utility; it should be treated by the Utilities Commission as if it were an addition to the equity component of the utility's capital structure.

17. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— fair rate of return**

There is no fixed "fair rate of return" applicable to all utility companies or to a single utility company at all times.

18. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— fair rate of return — debt-equity ratio**

A public utility's debt-equity ratio and its effect on the attraction of capital are circumstances to be weighed by the Utilities Commission in determining what is a fair rate of return on fair value.

19. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— prices paid for equipment and supplies — rate base**

The Utilities Commission may not fix or control prices which a company that is not a public utility within the definition contained in G.S. 62-3(23)a charges its customers; the Commission may, however, in a proper case, refuse to allow a public utility to include in its rate base or in its operating expenses the full price actually paid to another company for equipment and supplies.

20. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— public utility rates — reasonable cost of property**

In fixing rates to be charged by a public utility to its own customers, the Utilities Commission is directed by G.S. 62-133 to consider "the *reasonable* original cost of the utility's property used and useful in providing the service."

21. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— rate base — extravagance in purchases and construction**

A public utility may not inflate its rate base by extravagance in purchasing equipment or in constructing its plant, it being im-

Utilities Comm. v. Telephone Co.

material whether such extravagance is due to careless improvidence or to wilful payment of exorbitant prices to an affiliate.

22. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— prices paid by utility — authority of board of directors**

The management of the business of a public utility, including the fixing of the prices which it pays for construction and equipment of its plant and for its maintenance and operation, rests with its board of directors in the absence of a clear mismanagement or abuse of discretion.

23. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— public utility rates — disregard of corporate entity**

The doctrine of the corporate entity may be disregarded where it is used to defeat the public interest and circumvent public policy in the regulation of utility rates.

24. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— purchases from affiliated company — reasonableness of prices**

The fact that equipment or services are sold to a public utility by an affiliated corporation does not alter the ultimate question before the Utilities Commission of whether the prices paid by the utility are reasonable and, therefore, reflect the reasonable original cost of the properties.

25. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— purchase from affiliated company — reasonableness of price — burden of proof**

A purchase from an affiliated company calls for a close scrutiny by the Utilities Commission of the price paid by the utility; when such transaction is called in question, the burden is on the utility to show that the price it paid was reasonable.

26. **Telephone and Telegraph Companies § 1; Utilities Commission § 6— telephone rates — purchases from affiliated company — deduction for excess profits**

The Utilities Commission erred in deducting $978,000 from a telephone company's "net investment in plant" (original cost less depreciation) by reason of profits earned by an affiliated company on its sales to the telephone company, where the evidence shows that the affiliated company had an independent existence before it was acquired by the present parent company, that it was a supplier of materials and equipment to the telephone company during its independent life, that it continues to supply unaffiliated companies, that its prices to the telephone company are no higher and are often lower than its prices to nonaffiliated customers, that the telephone company receives the benefit of volume discounts obtained by the affiliated company from its suppliers, which discounts would not be available to the telephone company if it dealt directly with the affiliated company's suppliers, and that the telephone company receives refunds by reason of savings on the affiliated company's income taxes resulting from the affiliation, and nothing in the record indicates that the affiliated company was acquired or has been used by the parent company as a device through which to siphon off and conceal profits of the telephone company.

Utilities Comm. v. Telephone Co.

**27. Telephone and Telegraph Companies § 1; Utilities Commission § 6— rate increase — burden of proof**

The burden of proof is upon the utility seeking a rate increase to show the proposed rates are just and reasonable. G.S. 62-75; G.S. 62-134(c).

**28. Telephone and Telegraph Companies § 1; Utilities Commission § 6— overbuilding of utility plant — rate base**

The question for determination in connection with an alleged overbuilding of the utility plant is whether the properties in question can be deemed "used and useful" in rendering the service as of the end of the test period; if not, they may not be properly included in the rate base. G.S. 62-133.

**29. Telephone and Telegraph Companies § 1; Utilities Commission § 6— determination of plant requirements — latitude of directors**

Substantial latitude must be allowed the directors of a public utility in making the determination as to what plant is presently required to meet the service demand of the immediate future, since construction to meet such demand is time consuming and piecemeal construction programs are wasteful and not in the best interest of either the ratepayers or the stockholders.

**30. Telephone and Telegraph Companies § 1; Utilities Commission § 6— rate base — excess plant — interest of stockholders**

The deletion of excess plant from the rate base is not precluded by a showing that present acquisition or construction is in the best interest of the stockholders, since the present ratepayers may not be required to pay excessive rates for service to provide a return on property which will not be needed in providing utility service within the reasonable future.

**31. Telephone and Telegraph Companies § 1; Utilities Commission § 6— excess central office equipment — rate base**

The fact that a telephone company's central office equipment is not presently used to its full capacity does not necessarily justify the exclusion of any portion of it from the rate base on the theory that such portion is not presently "used and useful" in rendering service; on the other hand, a telephone company with central office equipment sufficient to serve any reasonably anticipated increase in customers may not properly add to its rate base additional units of central office equipment merely because, in the long future, it hopes to have customers who will use it, especially where the supplier of such equipment is an affiliated corporation controlled by the same holding company which controls the telephone company.

**32. Telephone and Telegraph Companies § 1; Utilities Commission § 6— plant requirements — determination by Utilities Commission**

The Utilities Commission's determination of how much plant is presently required to meet the service obligations of a public utility in the immediate future, supported by competent evidence, may not properly be set aside by the reviewing court merely because a different conclusion could have been reached upon the evidence.

Utilities Comm. v. Telephone Co.

33. **Telephone and Telegraph Companies § 1; Utilities Commission § 6—property "used and useful" — burden of proof**

The question of whether specific property is presently "used and useful" in rendering service is one of fact to be determined by the Utilities Commission upon competent and substantial evidence, the burden of proof being on the utility to show that the property should be included in the rate base. G.S. 62-75; G.S. 62-134(c).

34. **Telephone and Telegraph Companies § 1; Utilities Commission § 6—telephone rates — excess central office equipment**

The evidence supported a finding by the Utilities Commission that a portion of the property of a telephone company consisted of central office equipment not to be used by it in rendering telephone service within the reasonable future, and the Commission properly excluded such excess property from the computation of the original cost, less depreciation, in arriving at the fair value of the telephone company's properties used and useful in rendering telephone service.

35. **Telephone and Telegraph Companies § 1; Utilities Commission § 6—fair value**

"Fair value" of a public utility's property is not synonymous with "replacement cost," is not an arithmetical average of original cost and replacement cost, less depreciation, and is not to be ascertained by the application of any mathematical formula; conversely, a finding of "fair value" by the Utilities Commission is not rendered immune to judicial review by the Commission's declaration that, in reaching such finding, it followed no formula.

36. **Telephone and Telegraph Companies § 1; Utilities Commission § 6—ascertainment of fair value — factors — weight**

It is for the Utilities Commission, not the reviewing court, to determine the weight to be given each of the factors set forth in G.S. 62-133(b) for consideration in the ascertainment of "fair value"—original cost, replacement cost and other relevant factors.

37. **Telephone and Telegraph Companies § 1; Utilities Commission § 6—determination of fair value — appellate review**

The Utilities Commission's finding of "fair value" may be set aside by the reviewing court if it clearly appears (1) that the Commission disregarded or gave minimal consideration to one of the factors enumerated in G.S. 62-133(b), (2) that the Commission made its determination thereof by giving weight to a factor as to which there is no substantial evidence in the record, or (3) that the Commission considered unspecified facts other than original cost and replacement cost depreciated.

38. **Telephone and Telegraph Companies § 1; Utilities Commission § 6—fair value — factors — consideration by Utilities Commission**

The mere recital by the Utilities Commission that it has considered all of the factors prescribed by G.S. 62-133 in arriving at its ascertainment of "fair value" does not preclude the court from setting aside the finding of "fair value" where the record discloses error of law.

39. Telephone and Telegraph Companies § 1; Utilities Commission § 6— replacement cost — variance from expert testimony — reasons

It would be proper and helpful for the Utilities Commission to state, at least in summary, its reasons for not acquiescing in the figures suggested for replacement cost, less depreciation, by the respective expert witnesses.

40. Telephone and Telegraph Companies § 1; Utilities Commission § 6— public utility rates — determination of replacement cost

The Utilities Commission may in some cases fix rates to be charged by a utility for its service without a determination of replacement cost less depreciation, since the utility, with the Commission's acquiescence, may offer evidence of original cost less depreciation as its only evidence of fair value.

41. Telephone and Telegraph Companies § 1; Utilities Commission § 6— original cost — replacement cost — necessity for findings

When the record before the Utilities Commission presents the questions of original cost, less depreciation, and replacement cost, less depreciation, these are material issues of fact upon each of which the Commission must make its finding; when it does so, those findings are conclusive if supported by substantial evidence in the record and not affected by error of law.

42. Telephone and Telegraph Companies § 1; Utilities Commission § 6— replacement cost — errors or omissions in expert testimony

It is the prerogative of the Utilities Commission to take into account, in making its finding of replacement cost, errors or omissions in the testimony of an expert witness purporting to show such replacement cost.

43. Telephone and Telegraph Companies § 1; Utilities Commission § 6— fair value — cost of reproducing plant

The Utilities Commission is not required to accept as a factor to be weighed, in determining fair value, the full amount stated by an expert witness to be the cost of reproducing the exact plant now in operation, brick for brick, pole for pole, and wire for wire.

44. Telephone and Telegraph Companies § 1; Utilities Commission § 6— public utility rates — poor service — deduction from original cost and reproduction cost

Consistently poor service, attributable to defective or inadequate or poorly designed equipment or construction, justifies a subtraction from both the original cost and the reproduction cost of the existing plant before weighing such factors in ascertaining the present "fair value" of the properties; the Utilities Commission must make a specific finding showing the effect it gave this factor if such a deduction is made.

45. Telephone and Telegraph Companies § 1; Utilities Commission § 6— depreciation — change by Utilities Commission

If a reasonably close relationship between the reserve for depreciation and the actual accumulated depreciation is not present, the

Utilities Comm. v. Telephone Co.

Utilities Commission may and should review and make appropriate changes in the annual charge to operating expenses on account of depreciation.

**46. Telephone and Telegraph Companies § 1; Utilities Commission § 6— depreciation — presumption**

In the absence of convincing evidence to the contrary, the Utilities Commission is entitled to proceed on the assumption that the annual charges to operating expenses to cover depreciation, which the utility has been making with the Commission's approval, have been based on plausible assumptions as to downward trends in asset values in the course of their service lives.

**47. Telephone and Telegraph Companies § 1; Utilities Commission § 6— replacement cost — percentage of depreciation — deduction for plant inadequacy**

In the absence of convincing evidence to the contrary, the Utilities Commission may discount the replacement cost new by the same percentage as that indicated by the total accumulated depreciation in arriving at the replacement cost factor, or, if there is evidence to support such a finding, may discount replacement cost new by a greater or a smaller amount on account of depreciation, including obsolescence; the Commission may, after proper findings, further subtract from both original cost and replacement cost new an appropriate allowance for the inadequacy of the plant, if any, due to faulty engineering, faulty maintenance or other circumstance.

**48. Telephone and Telegraph Companies § 1; Utilities Commission § 6— failure to find replacement cost**

The Utilities Commission committed an error of law in failing to make a specific finding of its determination of the replacement cost of the utility's properties.

**49. Telephone and Telegraph Companies § 1; Utilities Commission § 6— rate base — plant under construction**

The Utilities Commission properly refused to include in the rate base telephone plant under construction at the end of the test period, since that is not property "used and useful" within the meaning of G.S. 62-133.

**50. Telephone and Telegraph Companies § 1; Utilities Commission § 6— objective of ratemaking**

The ultimate objective of ratemaking is the fixing of rates for service which will enable the utility to (1) produce a fair profit for its stockholders, (2) maintain its facilities and service, and (3) compete in the market place for capital, and no more. G.S. 62-133 (b) (4).

**51. Telephone and Telegraph Companies § 1; Utilities Commission § 6— fair rate of return — experience in attracting capital**

A utility's experienced success or difficulty in attracting capital on reasonable terms under the rates of which it complains is often more convincing than expert opinion testimony in determining a fair rate of return.

**52. Telephone and Telegraph Companies § 1; Utilities Commission § 6—rate of return — determination**

The weighing of the evidence and the drawing of the ultimate conclusion therefrom as to what return is necessary to enable a utility to attract capital is for the Utilities Commission, not the reviewing court.

**53. Telephone and Telegraph Companies § 1; Utilities Commission § 6—rate of return — fixing prior to ascertainment of fair value**

Without a finding by the Utilities Commission of the replacement cost of a public utility's properties "used and useful in providing the service," the Commission's finding of "fair value" was affected by an error of law and, consequently, its finding of a fair rate of return on such "fair value" was so affected and was premature.

**54. Telephone and Telegraph Companies § 1; Utilities Commission § 6—fair rate of return — fair value — appellate review**

The Utilities Commission must consider and weigh the testimony of expert witnesses on the question of the fair rate of return in the light of its own adjustment, for ratemaking purposes, of the utility's actual capital structure by its determination of the "fair value" of its properties; having done so, its determinations of the rate of return to be allowed, and the rates for service it deems sufficient to earn such rate of return, may not be modified or reversed by a reviewing court in the absence of a violation of a constitutional provision or of an error of law specified in G.S. 62-94(b).

**55. Evidence § 48; Utilities Commission § 6— rate hearing — qualification of expert**

The Utilities Commission did not err as a matter of law in allowing a witness experienced in public utility accounting and related financial matters to testify as to his opinion concerning the cost of capital and a fair rate of return.

**56. Evidence § 48— qualification of expert**

A witness qualified to testify as an expert in the field of his training and experience is not necessarily qualified to testify as an expert in other fields, even though somewhat related.

**57. Evidence § 48— qualification of expert — discretion of trial court**

The competency of a witness to testify as an expert is a question addressed primarily to the sound discretion of the trial court or commission, and its discretion is ordinarily not disturbed by a reviewing court.

**58. Evidence § 48— qualification of expert — officer, employee or consultant**

The fact that a witness is an officer or employee, or a consultant specially retained by a party to the litigation, does not disqualify him as an expert.

Chief Justice Bobbitt and Justices Higgins and Sharp concurring in part and dissenting in part.

SEPARATE appeals by all parties from the judgment of the Court of Appeals, reported in 12 N.C. App. 598, 184 S.E. 2d 526, reversing and remanding to the North Carolina Utilities Commission the order of the Commission allowing in part an application by General Telephone Company of the Southeast for an increase in its rates for telephone service.

General Telephone Company of the Southeast (General) is a wholly owned subsidiary of General Telephone & Electronics Company (GT&E). Automatic Electric Company (Automatic), a manufacturer of telephone equipment and supplies, is also a wholly owned subsidiary of GT&E. Automatic is the principal but not the only source of supply of such equipment and materials for General.

General renders telephone service to the public in this and other states. Its service area in North Carolina includes the City of Durham and the Towns of Creedmoor and Butner. Prior to the present proceeding, the North Carolina Utilities Commission (Commission) entered on 19 December 1968 an order granting rate increases to General, the rates then approved being, basically, those in effect when the present proceeding was instituted and being referred to herein as the present rates. In that order the Commission also directed that General make certain improvements in its service to its subscribers.

General instituted the present proceeding by filing with the Commission on 14 July 1970 its application for further increases in its rates for service, sufficient to increase its revenues from North Carolina intrastate telephone service by $2,472,554. Its application was based upon its alleged operating experience under the present rates during the twelve months ending 31 March 1970, the test period used throughout the present proceeding. The proceeding was designated a general rate case by the Commission. The City of Durham and the Attorney General intervened in opposition to the proposed rate increases, the city contending, among other things, that the service presently rendered by General is grossly inadequate.

The Commission conducted a hearing, which lasted approximately two weeks, and received thereat the testimony of many witnesses, expert and otherwise, together with a great mass of exhibits setting forth statistical data, prepared and

submitted by the various expert witnesses in support of their respective opinions.

Pursuant to the Rules of Practice before the Commission, the direct testimony of all expert and technical witnesses, both for the company and for the other parties, including the Commission's staff, and all exhibits in support of such testimony, were put in writing and filed with the Commission substantially in advance of the hearing. Copies thereof were made available to all parties, for study and preparation of cross-examination, prior to the commencement of the hearing and the actual giving of the testimony and introduction of the exhibits.

In addition to company officials and expert witnesses called by the company, the city and the Commission staff, the city called 51 witnesses, who testified concerning the quality of the service being rendered by General. Sixty other individuals, present for the purpose of testifying upon this subject, did not do so in the interest of time, the Commission being advised that their testimony would be substantially repetitious of that of the 51 witnesses actually called. The following is a catalog or summary of their testimony concerning the quality of General's service:

Telephones are frequently out of order. There are long delays in obtaining service after difficulties are reported, resulting in telephones being out of order for several days at a time. Supposedly private lines are not private, with the result that the subscriber to a private line frequently cannot use his telephone due to other conversations being carried on over the line. A subscriber seeking to get operator assistance frequently has to wait 15 minutes or more before the operator answers. Direct distance dialing results in reaching the wrong number more frequently than could be explained by inaccurate dialing. Calls are frequently cut off while the conversations are in progress. Innumerable incoming calls for the wrong number are received. Company employees in the lower echelons are discourteous and inefficient in receiving reports of service difficulties. There is little relation between the arrival of a repairman at the subscriber's home and the hour for which his arrival was promised by the central office, so that a complaining subscriber is kept at home waiting for him and then he comes when the subscriber is not at home, necessitating a new service call. Billing for long distance calls, not properly

chargeable to the subscriber's telephone, is frequent. On attempts to dial an outgoing call, the calling phone frequently disconnects before the other phone begins to ring. On incoming calls, the person placing the call frequently hears a ringing sound but the subscriber being called, though at home, hears no ring. Incoming long distance calls frequently do not get through to the subscriber's telephone. There is static on the line. Phones are frequently out of order in rainy weather. "It is inefficient to do business with the phone company by phone," because employees in the complaint department do not answer the telephone. "It is almost impossible to contact the telephone company."

The Commission made detailed findings of fact, including the following:

"(5) With the elimination of * * * plant under construction * * * the Applicant has invested in utility plant in service * * * as of the end of the test period * * * an original cost of $31,564,745. This figure reflects Applicant's net investment plus allowance for working capital, and is subject to further adjustments as hereinafter stated.

"(6) Applicant's investment in telephone plant is adjusted herein in the amount of $690,340, representing ½ of the amount testified to by the Commission Staff as relating to excess margin in central office equipment * * * . The Commission Staff's recommendation is reduced by 50% because a portion of the equipment considered to be excess margin during the test period will be utilized in the service improvement program of the Applicant in the immediate future.

"(7) Applicant's net investment in plant is further adjusted by $978,000 in regard to the excess profits which are reasonably attributed to its dealings with its major supplier Automatic Electric Company. This amount, however, is based on a 15% return to AE rather than the 12% return recommended by Witness Smith. These major adjustments, accompanied by standard related adjustments, yield an adjusted net investment in telephone plant for the Applicant's North Carolina intrastate operations of $30,107,171 for the test period.

                    *        *        *

"(9) The Commission finds that the fair value of the

Applicant's properties used and useful in rendering intrastate telephone service to its North Carolina subscribers, considering original cost less depreciation and considering replacement cost by trending original cost by current cost levels, is $31,913,601.

"(10) Applicant's net operating income for return at the end of the test period, and considering the adjustments hereinabove described, is $1,729,517, resulting in a rate of return on adjusted book value of 5.74%, which the Commission deems insufficient considering the Applicant's current operating conditions.

"(11) The rate of return deemed necessary on the fair value of Applicant's properties, with sound management, to produce a fair profit for its stockholders, considering economic conditions as they exist, and permitting Applicant to maintain its facilities and service and further permitting Applicant to improve its service in accordance with the terms of this Order, * * * is 7.53%, which said rate of return on fair value will afford Applicant an opportunity to realize additional annual gross revenues of $1,445,003. The Commission deems this amount of dollar return to the Applicant sufficient for it to compete in the market for capital funds on a reasonable basis to its customers and stockholders. This amount is a 16.04% increase over Applicant's present revenues and will afford the Applicant an opportunity to earn additional gross revenues in the above stated amount, being approximately 59.32% of the increases requested by the Applicant in this proceeding. The increases requested by the Applicant in excess of the above stated amount are deemed to be unjust and unreasonable by the Commission.

"(12) The additional revenues provided by the increases herein approved will produce a total net operating income of $2,469,106 and will result in a return on common equity to the Applicant of approximately 8.94%.

"(13) * * * Applicant's present engineering design techniques and standards are efficient and economical.

"(14) Applicant has made * * * improvements in service to its subscribers. * * * While there has been improvement in the quality of service, there remains a need

for additional improvements. The Commission finds that the overall quality of service afforded by the Applicant to its subscribers is on the low side of providing reasonably adequate service. The following specific service improvements are determined to be necessarily required to be completed on or before July 1, 1972 * * * ."

The Commission then stated in detail its conclusions, including the following:

"The Commission concludes that the rate of return on the fair value of Applicant's properties of 7.53% will afford the Applicant an opportunity to earn approximately $1,445,003 additional annual gross revenues being * * * 58.44%, requested by the Applicant.

"The total amount applied for by the Applicant is not supported by this record and would produce a return greater than that which could be deemed just and reasonable. The Commission concludes that additional gross revenues of $1,445,003 are necessary to provide a fair return to the Applicant on the fair value of its property.

" * * * The Commission concludes that [Automatic's] prices charged to the Applicant are unreasonable and excessive to the extent they produce a return higher than 15% on common equity [of Automatic]. The excess profits adjustment of $978,000 is made necessary because of the close relationship existing between [Automatic] and [General] which buys about 85% to 95% of its telephone equipment and supplies from [Automatic]. As a wholly-owned subsidiary of [GT&E], [Automatic] has been the leading supplier of telephone equipment to non-Bell companies. The dominant position of [Automatic] in the telephone equipment manufacturing market leaves only a few small low-volume non-affiliated manufacturers in the market with very little, if any, competitive forces available to them. Despite the Applicant's contention that competition does exist in this market, the Commission is of the opinion and concludes that the method utilized in this proceeding of adjusting for excess profits relating to the dealings between the Applicant and [Automatic] more nearly treats the operation of [Automatic] as another division or extension of the telephone operations of the Applicant. * * *

[I]t is reasonable to deal with [Automatic] and the Applicant for rate making purposes as one company subject to regulation by this Commission.

"The Commission Staff evidence indicates that the Applicant as of the end of the test period had excess plant margin in central office equipment amounting to approximately $1,380,680. * * * This Order reduces that figure by 50% in view of the Commission's opinion and conclusion that a portion of this equipment is being consumed and utilized in the service improvement program which is ongoing and imminent with respect to the Applicant's operations.

\*          \*          \*

"While the quality of telephone service afforded by the Applicant * * * has improved since its last general rate proceeding, the Commission concludes that Applicant's overall level of service is on the low side of reasonably adequate service."

The Commission thereupon ordered that General be authorized to make effective on bills rendered after 1 June 1971 rates and charges contained in an appendix made part of the order, these being sufficient to produce the additional revenues above mentioned. It further ordered that General be required to comply with specified service improvement requirements not later than 1 July 1972.

Commissioners Wells and McDevitt dissented in separate opinions, it being their view that: The Commission should have subtracted from the rate base the full amount of the excess central office equipment shown in the testimony of Witness Clemmons of the Commission Staff; the deduction from the rate base, on account of excess profits made by Automatic upon its sales to General, should have been larger; and, consequently, a smaller increase in rates for service should have been granted. Commissioner Wells was further of the opinion that the probable future revenues from the present rates were understated by the majority due to the rapidly progressing program to put all subscribers on single party lines, which will increase the average revenue per telephone even without any increase in the present rates. Both Commissioners Wells and McDevitt were of the opinion that at least a sub-

stantial part of the increases allowed should be withheld pending improvements by General in its service.

The Commission entered its order 11 May 1971. General and the city appealed to the Court of Appeals which rendered its decision 17 November 1971, reversing the order of the Commission and remanding the proceeding to it for further consideration "either upon the present record or after such further hearing as the Commission shall deem proper." Salient points in the opinion of the Court of Appeals are these:

1. Only after the determination of the fair value of the utility's property, used and useful in providing service, can judgment be intelligently exercised in fixing the rate of return which the utility is entitled to earn thereon. (General assigns this ruling as error.)

2. The Commission had ample authority to inquire into the reasonableness of the prices paid by General to Automatic for equipment and supplies and, to the extent that such prices were unreasonable, to reduce, accordingly, the amount otherwise determined to be the original cost to General of its properties used and useful in rendering telephone service. There was no error in the deduction from original cost of the properties made by the Commission on this account. (General now assigns this ruling of the Court of Appeals as error.)

3. The Commission erred in further reducing the amount otherwise found by it to be the original cost of the properties by $690,340 on account of alleged excess margin in central office equipment. (This ruling of the Court of Appeals is now assigned as error by the Commission, the Attorney General and the city.)

4. There was no error in the Commission's exclusion of plant under construction at the end of the test period from the rate base. (General assigns this ruling of the Court of Appeals as error.)

5. The Commission made no finding of fact and stated no conclusion as to the replacement cost of the properties, simply noting the testimony of General's Witness McGrath stating his opinion as to the net trended book cost and an exhibit introduced by General showing such net trended book cost of the North Carolina intrastate portion of the properties to be

$40,781,543 as of the end of the test period. "It is apparent," said the Court of Appeals, "that the Commission arrived at its ultimate determination as to the fair value of General's property by first determining original cost and then increasing that figure by 6%. This, the Court of Appeals said, is not supported by the record and "the Commission's finding of fair value in this case was not supported by competent, material and substantial evidence in the record and was arrived at by a method which failed to comply with the directives contained in G.S. 62-133 (b) (1)." (The Commission assigns this ruling of the Court of Appeals as error.)

6. The Commission's finding that the quality of service "is on the low side of providing reasonably adequate service" is ambiguous. If the Commission meant thereby that the quality of service fell short of the statutory requirement that it be adequate, efficient and reasonable, the Commission should make specific findings showing the effect of such inadequacy upon its decision as to the rates. The evidence of service deficiencies was such as to provide material facts which the Commission must consider in determining just and reasonable rates. Specific and unambiguous factual findings by the Commission are necessary to enable the reviewing court to determine whether the Commission has performed a duty imposed upon it by the statute in this respect. (The Commission assigns this ruling of the Court of Appeals as error.)

7. In view of the fact that the appropriate rate of return can be determined only after the fair value of the properties is correctly ascertained and, in view of the court's conclusion that the proceeding must be remanded to the Commission for further consideration and fixing of the fair value of the properties, the court did not pass upon the contention of General that the Commission committed error in fixing a fair rate of return at 7.53%.

8. Other exceptions by General and by the city to rulings of the Commission were found to be without merit.

The evidence before the Commission, concerning the respective questions presented by the several appeals to this Court, is summarized in the opinion.

*Attorney General Morgan, Deputy Attorney General Benoy and Associate Attorney Payne for the Attorney General.*

*Edward B. Hipp and Maurice W. Horne for the Utilities Commission.*

*Claude V. Jones for the City of Durham.*

*Newsom, Graham, Strayhorn, Hedrick & Murray, by A. H. Graham, Jr.*

*Power, Jones & Schneider, by John Robert Jones and William R. White; and Ward Wueste, Jr., General Counsel and Secretary, for the General Telephone Company of the Southeast.*

LAKE, Justice.

In the consideration of an appeal from an order of the Utilities Commission in a general rate case, such as this, it is necessary for the reviewing court to keep in mind certain fundamental facts and principles. Some of these are:

[1]  1. The State has granted to the utility company a legal monopoly upon a service vital to the economic well being and the domestic life of the people of a large territory. G.S. 62-110. This franchise is a property right of great value. Normally, when the grantee sells its business to another company, the monopolistic franchise commands a substantial price, over and above the exchange value of the physical properties transferred with it. Thus, the value of the franchise enters into and affects the market price of the utility's stock. It does not, however, enter into the computation of the utility's rate base. G.S. 62-133; *Galveston Electric Co. v. Galveston*, 258 U.S. 388, 396, 42 S.Ct. 351, 66 L.Ed. 678; 73 C.J.S., Public Utilities, § 21.

2. Because of this monopolistic feature of the utility's business, many of the basic principles of the Free Enterprise System, which govern the operations of and the charges by industrial and commercial corporations and those of the corner grocery store, have no application to the regulation of the service or charges of a utility company.

[2]  3. An uncontrolled legal monopoly in an essential service leads, normally and naturally, to poor service and exorbitant charges. See Adam Smith, The Wealth of Nations (3d Ed.), Book V. Chapter 1, pp. 143-144. To prevent such result, the

Legislature has conferred upon the Utilities Commission the power to police the operations of the utility company so as to require it to render service of good quality at charges which are reasonable. G.S. 62-31; G.S. 62-32; G.S. 62-130; and G.S. 62-131. These statutes confer upon the Commission, not upon this Court or the Court of Appeals, the authority to determine the adequacy of the utility's service and the rates to be charged therefor. *Utilities Commission v. Morgan, Attorney General,* 277 N.C. 255, 177 S.E. 2d 405; *Utilities Commission v. Telephone Co.,* 266 N.C. 450, 146 S.E. 2d 487; *Utilities Commission v. State* and *Utilities Commission v. Telegraph Co.,* 239 N.C. 333, 80 S.E. 2d 133.

[3, 4]    4. In fixing rates to be charged by a public utility, the Commission is exercising a function of the legislative branch of the government. It may not, therefore, exceed the limitations imposed upon the Legislature by the State and Federal Constitutions. The Commission, however, does not have the full power of the Legislature but only that portion conferred upon it in G.S. Chapter 62. In fixing the rates to be charged by a public utility for its service, the Commission must, therefore, comply with the requirements of that chapter, more specifically, G.S. 62-133. This is true, notwithstanding the fact that, in *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333, the Supreme Court of the United States held the Federal Constitution no longer requires such a procedure.

[5-7]    5. Upon appeal, the authority of the reviewing court, whether the Court of Appeals or this Court, to reverse or modify the order of the Commission, or to remand the matter to the Commission for further proceedings, is limited to that specified in G.S. 62-94, which includes the authority to reverse or modify such order on the ground that it violates a constitutional provision. *Utilities Commission v. Morgan, Attorney General, supra.* Upon such appeal, the rates fixed by the Commission, pursuant to G.S. Chapter 62, are deemed prima facie just and reasonable. G.S. 62-94 (e) ; G.S. 62-132. All findings of fact made by the Commission, which are supported by competent, material and substantial evidence, are conclusive. *Utilities Commission v. Coach Co.,* 269 N.C. 717, 153 S.E. 2d 461; *Utilities Commission v. Telegraph Co.,* 267 N.C. 257, 148 S.E. 2d 100; *Utilities Commission v. Coach Co.,* 261 N.C. 384, 134 S.E. 2d 689;

*Utilities Commission v. Champion Papers, Inc.*, 259 N.C. 449, 130 S.E. 2d 890; *Utilities Commission v. Towing Corp.*, 251 N.C. 105, 110 S.E. 2d 886. Neither such finding of fact nor the Commission's determination of what rates are reasonable may be reversed or modified by a reviewing court merely because the court would have reached a different finding or determination upon the evidence. *Utilities Commission v. Morgan, Attorney General, supra; Utilities Commission v. Railway Co.*, 267 N.C. 317, 148 S.E. 2d 210; *Utilities Commission v. Railway Co.*, 254 N.C. 73, 118 S.E. 2d 21; *Utilities Commission v. Towing Corp., supra.*

[8]  6. Notwithstanding the authority of the Commission to regulate its services and rates, and other matters incidental thereto, the property of the utility is private property and the business is private business. Except as otherwise provided, expressly or by reasonable implication, in G.S. Chapter 62, the utility is free to manage its property and business as it sees fit and the Commission may not restrict, or control, the discretion of the board of directors in the acquisition of property, or in the price paid for it. *Utilities Commission v. Gas Co.*, 254 N.C. 536, 119 S.E. 2d 469.

[9]  7. As a practical matter, apart from constitutional right, the utility must be able to attract from volunteer investors additional capital, as required from time to time for the expansion or improvement of its service. *Utilities Commission v. Morgan, Attorney General, supra;* G.S. 62-133 (b) (4) (5). Here, the principles of the Free Enterprise System do come into play, for the utility must win the favor of the free, volunteer investor in competition with all other investment options available to him. This the utility does by offering the investor an opportunity to earn on his investment at a rate which, considered together with the risk of loss of part or all of the principal of his investment, outweighs, in his opinion, the corresponding prospects and risks in those other types of investment. Obviously, the utility will have little appeal to many investors, strong appeal to others. Some investors paramount safety of principal, some the prospect of very large earnings. To attract capital, a utility does not need to charge, and it is not entitled to charge, for its service rates which will make its shares, or its bonds, attractive to investors who are willing to risk substantial loss of principal in return for the possibility of ab-

normally high earnings. The reason is the utility, having a legal monopoly in an essential service, offers its investors a minimal risk of loss of principal. *Bluefield Water Works & Improvement Co. v. Public Service Commission,* 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176; *Federal Power Commission v. Hope Natural Gas Co., supra.*

[10] 8. In order to assure the utility of earnings sufficient to attract capital and also in order to limit its charges for service to levels sufficient for that purpose, the Legislature has prescribed in G.S. 62-133 the steps which the Commission must take in fixing such charges. This statute requires the Commission to "ascertain the fair value of the public utility's property *used and useful* in providing the service." (Emphasis added.) In so doing, the Commission is required to *consider:* (1) "The *reasonable* original cost of the property" (emphasis added) less depreciation, (2) the replacement cost of the property, and (3) any other factors relevant to its fair value. The statute then requires the Commission to "fix such rate of return on the fair value of the property" as will enable the company, after payment of its "reasonable operating expenses," including taxes, maintenance of its properties and "reasonable actual depreciation," to attract, upon reasonable terms, such capital as it reasonably requires for the expansion and improvement of its service. Paragraph (d) of this statute further directs the Commission to "consider all other material facts of record that will enable it to determine what are reasonable and just rates."

[11] 9. The "fair value" which the statute requires the Commission to "ascertain" is not the price for which the property could be sold "as used or second-hand property." *Utilities Commission v. State* and *Utilities Commission v. Telegraph Co.,* 239 N.C. 333, 80 S.E. 2d 133. On the other hand, it is not the sale or exchange value of the entire business as a going concern, for that is determined by its prospective earnings. To undertake to regulate rates for service so as to maintain a value based on earnings leads into a vicious circle. "The property is not ordinarily the subject of barter and sale and, when rates themselves are in dispute, earnings produced by rates do not afford a standard for decision." Chief Justice Hughes, in *Los Angeles Gas Co. v. Railroad Commission,* 289 U.S. 287, 305, 53 S.Ct. 637, 644, 77 L.Ed. 1180. Accord: *Federal Power*

*Commission v. Hope Natural Gas Co., supra,* at p. 601; *Chambersburg Gas Co. v. Public Service Commission,* 116 Pa. Super. Ct. 196, 176 A 794, 797. See also, *General Telephone Co. of Upstate New York v. Lundy,* 17 N.Y. 2d 373, 218 N.E. 2d 274, 281. For the same reason, the "fair value" to be ascertained by the Commission is not the same as the fair value to be awarded by a jury in a condemnation case, for in the condemnation proceeding there is a forced sale of the property and the purpose is to award damages equal to the fair market or sale value at the time of the taking. *DeBruhl v. Highway Commission,* 247 N.C. 671, 676, 102 S.E. 2d 229.

[12-14] 10. The concept of "fair value," as used with reference to a public utility's rate base, is unique to rate making. To "ascertain" this "fair value" of the utility's property, the Commission is directed by the statute to *consider* the original cost of the properties, less depreciation, generally referred to as the "net investment," and also to *consider* the "replacement cost." Neither of these is the test of "fair value." "We are to remember that the cost of reproduction is a guide, but not a measure." Justice Cardozo, in *Dayton Power & Light Co. v. Public Utilities Commission,* 292 U.S. 290, 311, 54 S.Ct. 647, 78 L.Ed. 1267. "Ordinarily, the fair value of a utility's property is found to be less than the reconstruction cost of the property." Chief Justice Denny, in *Utilities Commission v. Telephone Co.,* 266 N.C. 450, 454, 146 S.E. 2d 487. Clearly, G.S. 62-133 contemplates that, normally, the Commission will "ascertain" the "fair value" of the properties at a point somewhere between the original cost, less depreciation, and the cost of replacement new, less depreciation. The Commission has the duty to weigh these evidences of "fair value" fairly in "balanced scales" and may not disregard either, or brush either aside by giving it "minimal consideration only." Justice Higgins, in *Utilities Commission v. Gas Co.,* 254 N.C. 536, 550, 119 S.E. 2d· 469. Accord: *Utilities Commission v. Telephone Co.,* 263 N.C. 702, 140 S.E. 2d 319. The Legislature has, however, designated the Commission to do the weighing of these elements, and the reviewing court may not set aside the Commission's determination of "fair value" merely because the court would have given the respective elements different weights and would, therefore, have arrived at a different "fair value." *Utilities Commission v. Morgan, Attorney General, supra,* at p. 267; *Utilities Commission*

*v. State* and *Utilities Commission v. Telegraph Co., supra,* at pp. 344 and 349; *Utilities Commission v. Telephone Co.,* 266 N.C. 450, 457, 146 S.E. 2d 487.

[15]   11. "Other facts" which the Commission considers in determining the "fair value" of the utility's properties must be found and set forth in its order, so that the reviewing court may see what these elements are and determine the authority of the Commission to consider them as "relevant to the present fair value." The statute does not contemplate that the Commission may "roam at large in an unfenced field" in the selection of such "other facts." Justice Higgins, in *Utilities Commission v. Public Service Co.,* 257 N.C. 233, 125 S.E. 2d 457.

[16]   12. The excess of "fair value," so ascertained by the Commission, over and above the original cost, less depreciation, is an unrealized paper profit to the utility. It is not a proper entry on the utility's balance sheet and does not appear there. It is not an addition to surplus, which is either distributable to stockholders or reinvestable in the business. It is, therefore, utterly different from an actual, earned surplus retained and reinvested in the business by the company. Nevertheless, G.S. 62-133 clearly contemplates that this excess shall be included in the rate base of the utility, just as if it were a realized profit invested in additional property used and useful in rendering service to the public. Since the holders of the utility's bonds and other evidences of indebtedness derive no benefit from this paper profit, it should be treated by the Commission in a proceeding to fix rates as if it were an addition to the equity component of the utility's capital structure.

[17]   13. There is no fixed "fair rate of return" applicable to all utility companies, or to a single utility company at all times. *Federal Power Commission v. Hope Natural Gas Co., supra,* at p. 603; *Smith v. Illinois Bell Tel. Co.,* 282 U.S. 133, 160, 51 S.Ct. 65, 75 L.Ed. 255; *United Railways v. West,* 280 U.S. 234, 249, 50 S.Ct. 123, 74 L.Ed. 390; *Bluefield Water Works & Improvement Co. v. Public Service Commission, supra,* at p. 692; *City of Alton v. Illinois Commerce Commission,* 19 Ill. 2d 76, 165 N.E. 2d 513, 519. In the Smith case, Chief Justice Hughes said:

"[A] rule as to rate of return cannot be laid down which would apply uniformly to all sorts of utilities; 'what

may be a fair return for one may be inadequate for another, depending upon circumstances, locality and risk.' * * * It is evident that in the present case we are not dealing with an ordinary public utility company, but with one that is part of a large system organized for the purpose of maintaining the credit of the constituent companies and securing their efficient and economical management."

[18] 14. A major factor in the element of risk is the company's capital structure. A low ratio of debt capital to total capital means less risk, both to the bondholder and to the stockholder. The lower the risk, the lower is the return required to attract capital. On the other hand, a high debt ratio, coupled with a rate of return on "fair value" which is in excess of the rate of the fixed interest charges on the debt component, provides a leverage, which results in a rate of return on the equity component substantially higher than the rate of return on "fair value." These are circumstances to be weighed by the Commission in determining what is a fair rate of return on "fair value." As above noted, the excess of "fair value" over the actual total capital of the company (debt capital, plus capital stock, plus actual surplus) is to be added to the equity component of the capital structure for the purpose of fixing rates under G.S. 62-133. The choice of the appropriate debt-equity ratio is a management decision, but the board of directors may not thereby tie the hands of the Commission and compel it to approve rates for service higher than would be appropriate for a reasonably balanced capital structure.

We turn now to the more difficult task of applying these principles to the specific questions arising on the record before us.

### Deductions From Rate Base Due To Purchases From Automatic Electric Company

Witnesses for General testified to the following effect:

Both General and Automatic are wholly owned subsidiaries of GT&E. Automatic was acquired by GT&E in 1955. As of 31 December 1969, GT&E's investment in Automatic was $328,909,188 and the consolidated book net worth of Automatic and its own subsidiaries was $235,991,550, on which Automatic earned 18.06%.

For many years prior to its acquisition by GT&E, Automatic was an independent manufacturer of telephone and electronic equipment and a major source thereof for telephone companies not affiliated with the Bell Telephone System, including all operating companies in the GT&E System. This business Automatic had secured on a competitive basis. Since such acquisition, the other affiliates of GT&E, including General, are not obligated by contract or otherwise to purchase equipment and supplies from Automatic. However, Automatic continues to be their principal, though not their sole supplier. Automatic continues to sell to telephone companies not affiliated with either the Bell System or the GT&E System. Most of its manufactured products are designed and engineered to the purchasing company's specifications.

Since the acquisition of Automatic by GT&E, its prices to GT&E affiliates, including General, are the same as or lower than its prices to telephone companies not affiliated with GT&E. On items sold but not manufactured by it, Automatic obtains from its own supplier discounts by virtue of the volume of its purchases. These discounts Automatic passes on to its operating affiliates, such as General, irrespective of the size of the purchases made from time to time by such affiliated operating companies. [This is one distinguishing feature of the present case from *Utilities Commission v. Morgan, Attorney General, supra,* concerning transactions between affiliates.] Generally, on items not designed to meet the specific customer's specification, Automatic's prices to General, and to other GT&E operating affiliates, are lower than the prices charged by competing independent suppliers; i.e., suppliers other than Western Electric Company, which is the principal supplier of the Bell System operating companies.

Since its acquisition by GT&E, Automatic has followed the same or similar pricing methods as prior to such affiliation. However, as a result of the affiliation, Automatic, under the Federal Internal Revenue Act, may disregard profits made by it on sales to affiliated companies, thus substantially reducing Automatic's income tax liability. This entire saving Automatic remits to GT&E, which, in turn, remits to its affiliated operating companies. In this way, General received in 1969 a total refund of $1,660,000 on account of its purchases from Automatic, totaling $17,802,000 (company-wide, not North Carolina alone). Also, since its affiliation with GT&E, Auto-

Utilities Comm. v. Telephone Co.

matic has introduced an inventory stocking plan which allows the affiliated operating companies, including General, to minimize their own inventories and use invoicing and other procedures which are beneficial to them.

Since its affiliation with GT&E in 1955, Automatic's sales to its nonaffiliated customers have increased from $37,000,000 to approximately $72,000,000, despite intervening acquisition by GT&E of a number of previously nonaffiliated customers of Automatic.

The Commission's Director of Accounting, who testified concerning the relation between Automatic and General, did not controvert any of the above summarized testimony given by witnesses for General. His testimony was to the effect that Automatic's sales to nonaffiliated domestic companies have declined in relation to Automatic's total sales. (This would be a natural consequence of the acquisition by GT&E of some of Automatic's previously unaffiliated customers.) He further testified that the dominant position of Automatic in the telephone equipment market, other than the Bell System, leaves only a few smaller manufacturers in the market with little, if any, competitive forces at their command. On the other hand, Automatic's existence depends upon the business it receives from GT&E affiliates and its entire operations are geared to the service of such affiliates.

For this reason, this witness recommended that the Commission permit General, for rate making purposes, to consider as the original cost of its purchases from Automatic, not the actual price paid to Automatic, but no more than a reasonable price, based on a fair return to Automatic upon its own net investment in properties required for the production of such commodities. He concluded that $1,417,000 should be subtracted from the original cost of General's properties, computed on the basis of prices actually paid by it, on the ground that this amount represented excess profits made by Automatic upon its sales to General for North Carolina intrastate service. Such excess he computed "on the concept of permitting the supplier affiliate the same rate of return on net book investment as that allowed by the Commission to the affiliate operating telephone company," which, in the opinion of the witness, should be 12% (i.e., on the equity component of General's capital structure). This concept would further require, in the opinion

of the witness, adjustments to the accumulated depreciation reserve and to operating expenses. In support of this concept, the witness cited the decision of the Court of Appeals of New York in *General Telephone Co. of Upstate New York v. Lundy, supra,* and orders of the New York, Pennsylvania and Wisconsin Commissions.

[19] The record does not indicate that Automatic carries on any operations in North Carolina. Furthermore, it is not a public utility within the definition contained in G.S. 62-3(23)a. It is not the parent of or a subsidiary of General, as those terms are defined in G.S. 55-2. Consequently, it is not brought within the definition of "public utility" by the provisions of G.S. 62-3(23)c. Neither the Commission nor the courts may add to the types of business defined by the Legislature as public utilities. *Utilities Commission v. Telegraph Co.,* 267 N.C. 257, 268, 148 S.E. 2d 100. Consequently, the Commission may not fix or control prices which Automatic charges its customers for its products. The Commission may, however, in a proper case, refuse to allow General to include in its rate base, or in its operating expenses, the full price General actually paid Automatic for equipment and supplies.

In its proper regulation of rates charged by General, the Commission is expressly authorized to inspect the books and records of affiliated corporations and to investigate contracts and practices between the operating utility company and its holding company. G.S. 62-37 and G.S. 62-51. G.S. 62-153, which authorizes the Commission, after hearing, to disapprove and declare void contracts between a public utility and certain types of affiliated corporations is not before us in the present case and nothing herein may be deemed to limit the powers granted to the Commission by that statute.

[20, 21] In fixing rates to be charged by a public utility to its own customers, the Commission is directed by G.S. 62-133 to consider "the *reasonable* original cost of the utility's property used and useful in providing the service." (Emphasis added.) Obviously, a utility may not inflate its rate base by extravagance in purchasing equipment or constructing its plant. In this connection, it is immaterial whether such extravagance be due to careless improvidence or to wilful payment of exorbitant prices to an affiliate. See: *State v. Morgan, Attorney General, supra,* at pp. 271-272; *Pacific Telephone & Telegraph*

*Co. v. Public Utilities Commission,* 34 Cal. 2d 822, 215 P. 2d 441. As Mr. Justice Brewer said, in *Chicago & Grand Trunk Railway v. Wellman,* 143 U.S. 339, 346, 36 L.Ed. 176, 180, "While the protection of vested rights of property is a supreme duty of the courts, it has not come to this, that the legislative power rests subservient to the discretion of any railroad corporation which may, by exorbitant and unreasonable salaries, or in some other improper way, transfer its earnings into what it is pleased to call 'operating expenses'."

[22]  On the other hand, the management of the business of a public utility, including the fixing of the prices which it pays for the construction and equipment of its plant and for its maintenance and operation, rests with its board of directors in the absence of clear mismanagement or abuse of discretion. *Utilities Commission v. Gas Co.,* 254 N.C. 536, 548, 119 S.E. 2d 469; *United Fuel Gas Co. v. Railroad Commission,* 278 U.S. 300, 320, 49 S.Ct. 150, 73 L.Ed. 390; *Southwestern Bell Telephone Co. v. Public Service Commission,* 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981; *Chambersburg Gas Co. v. Public Service Commission,* 116 Pa. Super. Ct. 196, 176 A. 794, 806.

[23]  As observed by Justice Traynor, later Chief Justice, in *Pacific Telephone & Telegraph Co. v. Public Utilities Commission, supra,* at p. 826, the advent of the holding company, which both controls and provides, either directly or indirectly through another subsidiary, services for a network of operating utilities, has been the source of new problems in public utility rate regulation. As the Supreme Court of California there observed, and as we stated in *Utilities Commission v. Morgan, Attorney General, supra,* at p. 272, the doctrine of the corporate entity may be disregarded where it is used to defeat the public interest and circumvent public policy in the regulation of utility rates.

[24, 25]  However, the fact that equipment or services are sold to the utility by an affiliated corporation does not alter the ultimate question for the Commission. That question is whether the prices paid by the utility are reasonable and, therefore, reflect the "reasonable original cost" of the properties. The only effect of the affiliation between the utility and its supplier is that such relationship calls for a close scrutiny by the Commission of the price paid by the utility. *Dayton Power & Light Co. v. Public Utilities Commission of Ohio,* 292 U.S. 290, 295,

308, 54 S.Ct. 647, 78 L.Ed. 1267; *Lindheimer v. Illinois Bell Telephone Co.*, 292 U.S. 151, 156, 54 S.Ct. 658, 78 L.Ed. 1182; *Western Distributing Co. v. Public Service Commission of Kansas,* 285 U.S. 119, 124, 52 S.Ct. 283, 76 L.Ed. 655; *Smith v. Illinois Bell Telephone Co.*, 282 U.S. 133, 152, 51 S.Ct. 65, 75 L.Ed. 255; *Pacific Telephone & Telegraph Co. v. Public Utilities Commission, supra; General Telephone Co. of Upstate New York v. Lundy, supra; Solar Electric Co. v. Public Utilities Commission,* 137 Pa. Super. Ct. 325, 9 A. 2d 447, 473. Where the purchase is made from an affiliated company, the bargaining is not at arm's length and when the transaction is called in question, the burden is upon the utility to show that the price it paid was reasonable. As was said in *Solar Electric Co. v. Public Utilities Commission, supra:*

"Charges arising out of intercompany relationships between affiliated companies should be scrutinized with care [citations omitted] and if there is an absence of data and information from which the reasonableness and propriety of the services rendered and the reasonable cost of rendering such services by the servicing companies can be ascertained by the commission, allowance is properly refused. * * *

"Moreover, the record in this case is an illustration of the fact that effective and satisfactory State regulation of utilities is made increasingly difficult by the progressive integration of utility services under holding company domination.

"The desire of public utility management, evidenced by various methods, to secure the highest possible return to the ultimate owners is incompatible with the semi-public nature of the utility business, which the management directs. It therefore follows that the commission should scrutinize carefully charges by affiliates, as inflated charges to operating companies may be a means to improperly increase the allowable revenue and raise the cost to the consumers of utility service as well as an unwarranted source of profit to the ultimate holding company."

Similarly, the Court of Appeals of New York, in *General Telephone Co. of Upstate New York v. Lundy, supra,* observed:

"When such materials and services are obtained through contracts which are the result of arm's-length bargaining in the open market, the contract price is usually accepted as the proper cost. However, when a utility and its suppliers are both owned and controlled by the same holding company, the safeguards provided by arm's-length bargaining are absent, and ever present is the danger that the utility will be charged exorbitant prices which will, by inclusion in its operating costs, become the predicate for excessive rates."

In *United Fuel Gas Co. v. Railroad Commission, supra,* at p. 320, Mr. Justice Stone, later Chief Justice, said:

"We recognize that a public service commission, under the guise of establishing a fair rate, may not usurp the functions of the company's directors and in every case substitute its judgment for theirs as to the propriety of contracts entered into by the utility; and common ownership is not of itself sufficient grounds for disregarding such intercorporate agreements when it appears that, although an affiliated corporation may be receiving the larger share of the profits, the regulated company is still receiving substantial benefits from the contract and probably could not have secured better terms elsewhere."

[26] The uncontradicted evidence offered by Automatic before the Commission in the present case is to the effect that Automatic had an independent corporate existence long before it became a part of the GT&E System. It was not brought into being, and nothing in the record indicates that it was acquired by GT&E or has been used by it, as a device through which to siphon off and conceal profits of the affiliated utility. During its independent life it was a supplier of materials and equipment to General. It continues to supply unaffiliated telephone companies. Its prices to General are no higher and are often lower than its prices to such nonaffiliated customers. Though this circumstance is not controlling, it is relevant. General receives the benefit of volume discounts obtained by Automatic from its suppliers, which discounts would not be available to General if it dealt directly with Automatic's suppliers. In addition, General receives refunds by reason of savings on Automatic's income taxes due to Automatic's now being a member of the GT&E System. In view of benefits to General, resulting

from the affiliation, we cannot deem the fact that Automatic earns, on its own net investment in its properties, a return somewhat higher than that which might be deemed reasonable earnings by General, on the equity component of its own capital structure, sufficient basis for disallowance of part of the prices actually paid by General to Automatic in the computation of General's rate base. We are compelled to the conclusion that there is no substantial evidence in this record to support a finding that the prices charged by Automatic to General are so excessive as to indicate bad faith or mismanagement by the directors of General. The complete absence of any evidence tending to show an abuse of the doctrine of the corporate entity so as to conceal excessive rates for telephone service distinguishes this case from *Utilities Commission v. Morgan, Attorney General, supra.*

Consequently, we hold that the Court of Appeals erred in affirming the deduction by the Commission of $978,000 from General's "net investment in plant" (original cost less depreciation) by reason of profits earned by Automatic upon its sales to General. This finding by the Commission is not supported by the evidence.

### *Deduction From Rate Base On Account Of Excess Margin In Central Office Equipment*

Witnesses for General testified to the following effect concerning additions to plant:

All telephone companies operating in North Carolina had a combined station growth of 96% from 1960 to 1970. General's station growth in that period was 91.7%.

At the time of the hearing, General anticipated that its construction of "outside plant," as contrasted with central office construction and equipment, would be a larger proportion of its total construction program in 1971 than had been the case in 1970. It is moving toward a complete one-party service; that is, it is moving toward the elimination of two-party and multi-party lines. [This will, of course, increase its average revenue per telephone without any increase in the present rates for service. It will also increase to some extent its investment in plant per telephone.]

The company contemplates gross additions to its telephone plant in North Carolina, including both interstate and intra-

Utilities Comm. v. Telephone Co.

state operations, of approximately $10,000,000 per year for the next five years. In the three year period ending 30 November 1970, General's investment in telephone plant in service in North Carolina increased from $30,143,000 to $50,809,000, an increase of 69%, and in the same period its primary or main telephones in service increased from 41,338 to 51,096, an increase of 24%.

The Chief Engineer of the Commission, Mr. Clemmons, testified:

General's investment in central office equipment increased 127.5% for the three years of 1967, 1968 and 1969. This increase was at such a rapid rate that main station growth has not been able to keep pace with the investment. He made a study to determine whether General's investment in plant included central office equipment not reasonably needed during the test period. As a result of this study he found that on 31 March 1970, the end of the test period, there were 16,202 lines, representing an investment of $1,457,000, and 7,236 terminals, representing an investment of $253,355 available but not in use.

Mr. Clemmons also made a study to determine the engineering interval for the last line and terminal additions at each central office. In his opinion, an engineering interval of two and one-half years for large central office additions and three years for small additions is reasonable. The term "engineering interval," so used by him, means the period beginning with the completed installation of the equipment and ending when it is completely in service, so that it no longer affords margin for further growth in business. Substantial line and terminal additions were made during the test period, or within the few months immediately preceding it. The long engineering intervals, for which these additions made during, or just prior to, the test period provided, resulted in the above mentioned lines and terminals being included in the plant during the test period in excess of those needed for a two and one-half year engineering interval. The company's program for conversion of its system to an all one-party service is scheduled to be completed by the end of 1973, with most of the conversion to be completed by the end of 1972. Consequently, this does not explain the excessive quantity of lines and terminals exceeding the two and one-half year engineering interval.

Mr. Clemmons' final conclusion was that "the quantity of lines and terminals installed just prior to and during the test period was exceptionally large for the reason that they were in some cases engineered for long periods of time and also the regrade program required more equipment than would normal growth." Exhibit 22, prepared and introduced in evidence by this witness, showed that at the end of the test period the company had 9,842 lines, representing an investment of $885,900, and 4,711 terminals, representing an investment of $164,830, installed but not actually in use, all of which exceeded the appropriate engineering interval of two and one-half years from the end of the test period. In the witness' opinion, this was excess plant margin at the end of the test period. A substantial portion of the lines and terminals, installed but not in use at the end of the test period, will be used for regrade and new growth at some time in the future.

Rule 1-21(b)(1) of the Rules of Practice Before the Utilities Commission, promulgated pursuant to G.S. 62-72, requires that the exhibits and direct testimony of expert witnesses to be offered by the Commission's staff in a general rate case be reduced to writing, filed with the Commission and made available to the utility company not less than twenty days prior to the commencement of the hearing. Thus, General had full notice of the evidence to be given by Mr. Clemmons. Nevertheless, General offered no evidence to rebut his expert opinion that two and one-half years is a reasonable engineering interval for the planning and installation of lines and terminals for future station growth, or to rebut his testimony that, as of the end of the test period, General had installed the above mentioned lines and terminals which were not in use at the end of the test period and which could not reasonably be anticipated to be put in use until more than two and one-half years after the end of the test period. These unused lines and terminals represent a total investment of $1,050,730, which is reflected in the net investment (original cost less depreciation) shown on General's books. The Commission, in reaching its finding of the original cost, less depreciation, eliminated $690,340 on this account. The Court of Appeals held this was error. The city contends the full amount of the excess, as shown in the testimony of Mr. Clemmons, should have been eliminated.

[27] The burden of proof is upon the utility seeking a rate increase to show the proposed rates are just and reasonable. G.S. 62-75; G.S. 62-134(c); *Utilities Commission v. Railway Co.,* 267 N.C. 317, 148 S.E. 2d 210.

[28] The question for determination in connection with an alleged overbuilding of the utility plant is whether the properties in question can be deemed "used and useful" in rendering the service, as of the end of the test period. If not, they may not properly be included in the rate base. G.S. 62-133; *Utilities Commission v. Morgan, Attorney General, supra,* at p. 268; *Utilities Commission v. Gas Co.,* 254 N.C. 536, 548, 119 S.E. 2d 469. As the Supreme Court of Oregon said, in *Pacific Telephone & Telegraph Co. v. Wallace,* 158 Ore. 210, 231, 75 P. 2d 942, 951:

> "We are well satisfied that the company cannot include within its valuations property which it neither used nor was useful to the public service. Property which was not reasonably necessary to the adequate furnishing of telephone service must be excluded from the rate base."

Similarly, in *St. Joseph Stockyards Co. v. United States,* 11 F. Supp. 322, 329 (W.D. Mo.), aff'd 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033, the Court said:

> "The matter of including or excluding land or property held for business expansion in the rate base is the matter of who—the ratepayers or the company—shall carry property which is not being used to produce the service paid for by the rate. Obviously, it may be proper and good business judgment may sometimes dictate provision for future expansion of the business. It is equally clear that, so far as the present ratepayers are concerned, there must be a limit to the extent to which they can be compelled to pay for providing possible future facilities for future business. While a broad power and discretion must be left undisturbed in company management, yet, even as to expenditures directly entering into the present service for which the now customer pays, this discretion is not beyond control. [Citations omitted.] It would seem that such control should be much more extensive where the expenditure has no part whatsoever in furnishing the service paid for. In fact, the general doctrine is that the rate base is made up of values used in furnishing the service."

Justice Holmes, speaking for the Court in *San Diego Land & Town Co. v. Jasper,* 189 U.S. 439, 446, 23 S.Ct. 571, 47 L.Ed. 892, said:

"If a plant is built * * * for a larger area than it finds itself able to supply, or, apart from that, if it does not, as yet, have the customers contemplated, neither justice nor the Constitution requires that, say, two-thirds of the contemplated number should pay a full return."

At the time he so spoke, the Supreme Court of the United States followed the view that the Federal Constitution required regulatory commissions to comply with the rule of *Smyth v. Ames,* 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819, from which G.S. 62-133 is derived.

Justice Cardozo, speaking for the Court in *Columbus Gas & Fuel Co. v. Public Utilities Commission,* 292 U.S. 398, 407, 54 S.Ct. 763, 78 L.Ed. 1327, said:

"[Certain gas leases purchased by the utility] ought not in fairness to be capitalized until present or imminent need for use as sources of supply shall have brought them into the base upon which profits must be earned. To capitalize them sooner is to build the rate structure of the business upon assets held in idleness to abide the uses of the future."

To the same effect are: *Cedar Rapids Gaslight Co. v. City of Cedar Rapids,* 144 Iowa 426, 120 N.W. 966, 969, and *Public Service Commission v. Montana-Dakota Utilities Co.* (N.D.), 100 N.W. 2d 140, 150.

[29, 30] On the other hand, a public utility is under a present duty to anticipate, within reason, demands to be made upon it for service in the near future. *Idaho Underground Water Users Association v. Idaho Power Co.,* 89 Idaho 147, 404 P. 2d 859; *Wisconsin Telephone Co. v. Public Service Commission,* 232 Wis. 274, 343, 287 N.W. 122. Substantial latitude must be allowed the directors of the utility in making the determination as to what plant is presently required to meet the service demand of the immediate future, since construction to meet such demand is time consuming and piecemeal construction programs are wasteful and not in the best interests of either the ratepayers of the stockholders. *Springfield v. Springfield*

*Gas & Electric Co.,* 291 Ill. 209, 234, 125 N.E. 891, 901; *Latourneau v. Citizens' Utilities Co.,* 125 Vt. 38, 209 A. 2d 307; *Pacific Telephone & Telegraph Co. v. Department of Public Service,* 19 Wash. 2d 200, 142 P. 2d 498; *Wisconsin Telephone Co. v. Public Service Commission, supra;* 73 C.J.S., Public Utilities, § 18a. However, Commission action deleting excess plant from the rate base is not precluded by a showing that present acquisition or construction is in the best interests of the stockholders. The present ratepayers may not be required to pay excessive rates for service to provide a return on property which will not be needed in providing utility service within the reasonable future.

[31] The overbuilding of plant may occur in a variety of ways. For example, a spare tire is presently used and useful in the operation of an automobile, but twenty spare tires carried in the trunk would be beyond the limit of sound management. A power line may properly be built to carry voltage in excess of that required to serve customers presently in a growing area, since otherwise a line constructed today must be replaced within a short time. *Latourneau v. Citizens Utility Co., supra.* An office building or a storage warehouse may properly be built today, with capacity larger than presently needed, if greater need may reasonably be expected in the near future. A pipe line may be laid today in the mere hope that some day the area it reaches may be occupied by industries and in the belief that, in that event, the cost of laying such a line may be greater than now. See, *Pacific Telephone & Telegraph Co. v. Department of Public Service supra,* at p. 513. The inclusion of such a line in the utility's rate base places an unreasonable burden on today's ratepayers. Thus, the fact that a transmission line, a building or a telephone company's central office equipment is not presently used to its full capacity does not necessarily justify the exclusion of any portion of it from the rate base on the theory that such portion is not presently "used and useful" in rendering service. On the other hand, a telephone company, with central office equipment sufficient to serve any reasonably anticipated increase in customers, may not properly add to its rate base additional units of central office equipment merely because, in the long future, it hopes to have customers who will use it. This is especially true where the supplier of such equipment is an affiliated corporation, controlled by the same holding company which controls the telephone company.

[32]  It must be borne in mind that, customarily, the utility selects the time for filing an application for an increase in its rates for service and thereby fixes the test period. Within limits, it has the opportunity to pad its rate base with excess additions to plant immediately before or during the test period. Such additions to plant will produce little or no revenues during the test period and so will artificially depress the rate of return for such period. If rates for service are now fixed so as to yield, from the customers served at the end of the test period, a fair return on the total plant, including such excess construction, then, in the future years, when the excess plant is actually rendering service and producing revenue, the return on the total plant may well be excessive. The self interest of the utility alone may well lead its management into such speculative construction of plant. While the Commission should allow the directors of the utility considerable latitude in the exercise of their business judgment, concerning how much plant is presently required to meet the service obligations of the utility in the immediate future, the courts must give the Commission some measure of discretion in the discharge of its duty to protect the ratepayers against a padded rate base. The Commission's determination, supported by substantial evidence, may not properly be set aside by the reviewing court merely because a different conclusion could have been reached upon the evidence. *Utilities Commission v. Morgan, Attorney General, supra,* at p. 267; *Utilities Commission v. Railway Co.,* 267 N.C. 317, 326, 148 S.E. 2d 210; *Utilities Commission v. Champion Papers, Inc.,* 259 N.C. 449, 130 S.E. 2d 890; *Utilities Commission v. Railway Co.,* 254 N.C. 73, 84, 118 S.E. 2d 21; *Utilities Commission v. Towing Corp.,* 251 N.C. 105, 109, 110 S.E. 2d 886.

[33]  The question of whether specific property is presently "used and useful" in rendering service is one of fact to be determined by the Commission upon competent and substantial evidence. *Southern New England Telephone Co. v. Public Utilities Commission,* 29 Conn. Super. 253, 282 A. 2d 915, 919; *Latourneau v. Citizens Utilities Co., supra.* On this question, the burden of proof is upon the utility to show that the property should be included in its rate base, for it has the burden of showing that its proposed increase in rates is just and reasonable. G.S. 62-75; G.S. 62-134(c).

[34] There is unquestionably substantial, competent evidence in the record before us to support the finding of the Commission that a substantial portion of the property of General, asserted by it to be a proper part of its rate base, consisted of central office equipment not to be used by it in rendering telephone service within the reasonable future. General, having full advance knowledge that this evidence would be offered by the Commission Staff, did not introduce any evidence to refute it. Under these circumstances, it was error for the Court of Appeals to set aside the Commission's finding that such excess property should be excluded from the computation of the original cost, less depreciation, in arriving at the fair value of the properties of General used and useful in rendering telephone service.

The city's exception to the refusal of the Commission to subtract from the original cost, less depreciation, of the properties the full amount deemed by Mr. Clemmons to be excess plant margin cannot, however, be sustained. The finding of the Commission as to the extent of the excess is supported, though not compelled by the testimony of Mr. Clemmons, himself.

## Fair Value Of The Properties

In its application, General alleged that the net book cost of its properties used in intrastate service in North Carolina as of the end of the test period, 31 March 1970, was $33,467,015, which, together with its cash working capital and materials and supplies on hand, gave it a total net investment, as of that date, in the amount of $34,531,781. This includes plant under construction at the end of the test period and the amount eliminated by the Commission as excess plant margin. It alleged that the net trended cost of its properties, including the above mentioned items, was such as to give it a rate base as of the end of the test period of $43,480,850. The testimony and exhibits prepared and introduced by General's controller, Mr. Redman, are to the effect that the original cost of its intrastate plant in service at the end of the test period was $39,030,988 against which General has, through annual charges with Commission approval, accumulated a depreciation reserve in the total amount of $6,635,641, giving it an end of period net investment in plant of $32,395,347 (original cost less depreciation). This figure also includes plant under construction and the amount

disallowed by the Commission as excess margin. [Thus, the accumulated depreciation reserve is approximately 17% of the original cost of the properties prior to any deductions for these items.]

General's Witness McGrath testified that the trended cost of the properties, including plant under construction and the entire plant margin, as of the end of the test period, was $52,930,678 and the net trended cost thereof was $49,409,698. [The difference, $3,520,980, is this witness' allowance for depreciation, this being only 6.65% of his estimated trended cost of the properties.] Apparently, Mr. McGrath's figures relate to General's entire plant in North Carolina, including the portion attributable to interstate service, which if true, would require a substantial further reduction therefrom. His estimate of 6.65% depreciation was the result of his inspection of the plant and the exhibit prepared and introduced by him showed, among the several property accounts [i.e., types of property], he observed only "pole lines" to have depreciated as much as the 17% reflected in General's accumulated depreciation reserve.

Mr. McGrath testified that his trended cost figure was intended by him to represent the "fair value" of General's properties. In this computation, he made no determination as to whether the plant in service was properly engineered. He testified, "I trended what was on the books of the company * * * I don't know what the book reserve [for depreciation] is. I haven't had it. * * * I am out there telling the condition, physical condition of the plant as of today. * * * *I am taking the original piece of equipment and replacing it, the same design, brick for brick,* and value has nothing to do with potential buyers and sellers and value on the market. It is my understanding that it is replacing, and the fair value is set up for me to replace it as an Engineer. I cannot go out and re-engineer a plant." (Emphasis added.) In response to the question, "Replacement is something that would render the same service using current technology which may produce a substantial different result than trending the existing plant to current cost?" Mr. McGrath replied: "I am not permitted to do that. That is not the value I am permitted to use. I would get a different value but I am not allowed to do it." [Thus, this witness' estimate of trended cost takes no account of obsolescence or of

faulty engineering, but is his opinion as to the trended original cost of the properties actually in use, less his own estimate of physical depreciation only, with no deduction for the defects in service described by the 51 subscriber witnesses and found by the Commission, many of which would appear to be attributable to the condition of the equipment.]

The Commission Staff offered the evidence of its Staff Engineer, Mr. Cash. He testified that General's density of 181 stations per square mile is the highest in the State and over four times that of the State average. From this circumstance he would normally expect General's investment in plant per telephone in service to be below the State average. However, General's investment in plant per station is $573.00, as compared with the State average of $526.00. He attributed General's greater investment per station, in large part, to General's crash program of construction in 1968 and 1969. In his opinion, this comparative investment per station is a fact which should be considered by the Commission in determining the fair value of General's properties.

The Commission Staff's Chief Engineer, Mr. Clemmons, testified that service problems still exist in several areas of General's operations in North Carolina. He found only 7.16% of the pay stations checked were in operational condition. He further found that the failure rate for calls, inter-office and intra-office combined, was 2.74% and that the number of "initial trouble reports per 100 stations" was 8.5, whereas the figure should be in the range of 6 per 100 stations. He testified: "I would compare Durham [i.e., General] to Southern Bell in Raleigh, and Raleigh's Southern Bell is reported for the month of December, 1970 total subscriber trouble reports of 4.22 per 100 stations. For General * * * for December, 1970, initial trouble reports were 7.3 per 100 stations, Charlotte for the month of December 3.43, Greensboro 5.06."

The Commission Staff Accountant, Mr. Peele, testified that General's investment in telephone plant in North Carolina increased $9,559,134 in the 16 months immediately prior to the test period used in this proceeding, and an additional $6,972,105 as added to its investment in plant during the test period. [This coincides with the period in which, according to Staff Engineer Cash, General was engaged in a crash program of construction, and coincides with the period in which Chief Engineer Clem-

mons found the company installed the central office equipment far in excess of a reasonable engineering interval.]

G.S. 62-133(b) requires the Commission to "ascertain," that is, to find "the fair value of the public utility's property used and useful in providing the service." In so doing, the statute requires the Commission to *consider* (1) "the reasonable original cost," less depreciation, (2) the "replacement cost," which may be determined by trending such reasonable depreciated cost to current cost levels or by any other reasonable method, and (3) any other relevant factor.

[35]  Quite obviously, "replacement cost" and "fair value" are not synonymous. It is equally clear that "fair value" is not an arithmetical average of original cost and replacement cost, less depreciation, nor is it to be "ascertained" by the application of any mathematical formula. Conversely, a finding of "fair value" by the Commission is not rendered immune to judicial review by the Commission's declaration that, in reaching such finding, it followed no formula. The statute contemplates a "considering" or a weighing of the three factors by the Commission in the exercise of its own expert judgment. *Utilities Commission v. Telephone Co.,* 266 N.C. 450, 454, 146 S.E. 2d 487; *Utilities Commission v. Public Service Co.,* 257 N.C. 233, 237, 125 S.E. 2d 457; *Utilities Commission v. State* and *Utilities Commission v. Telegraph Co.,* 239 N.C. 333, 344, 349, 80 S.E. 2d 133; *Railroad Commission v. Pacific Gas & Electric Co.,* 302 U.S. 388, 398, 58 S.Ct. 334, 82 L.Ed. 319; *Dayton Power & Light Co. v. Public Utilities Commission,* 292 U.S. 290, 311, 54 S.Ct. 647, 78 L.Ed. 1267; *Los Angeles Gas Corp. v. Railroad Commission,* 289 U.S. 287, 53 S.Ct. 637, 644, 77 L.Ed. 1180; Minnesota Rate Cases, 230 U.S. 352, 434, 33 S.Ct. 729, 57 L.Ed. 1511; *New England Tel. & Tel. Co. v. Public Utilities Commission,* 148 Me. 374, 94 A. 2d 801; *State v. Hampton Water Works Co.,* 91 N.H. 278, 18 A. 2d 765; *New York Telephone Co. v. Public Service Commission,* 309 N.Y. 569, 132 N.E. 2d 847; *City of Pittsburgh v. Public Utility Commission,* 187 Pa. Super. Ct. 341, 144 A. 2d 648.

[36-38]  The determination of the weight to be given each of the above factors in its ascertainment of "fair value" is for the Commission, not the reviewing court. But if it is clear from the record that the Commission reached its finding of "fair value" by disregarding or giving "minimal" consideration to

one of the above enumerated factors, its finding of the ultimate fact of "fair value" may be set aside by the court on the ground of error of law in such ascertainment. *Utilities Commission v. Telephone Co.,* 263 N.C. 702, 707, 140 S.E. 2d 319; *Utilities Commission v. Gas Co.,* 254 N.C. 536, 119 S.E. 2d 469. Similarly, the finding of "fair value" may be set aside by the reviewing court if it clearly appears that the Commission has made its determination thereof by giving weight to a factor as to which there is no substantial evidence in the record. *Utilities Commission v. Coach Co.,* 261 N.C. 384, 134 S.E. 2d 689. It is likewise where the order of the Commission shows that it reached its determination of "fair value" by considering unspecified facts other than original cost and replacement cost depreciated. *Utilities Commission v. Public Service Co.,* 257 N.C. 233, 125 S.E. 2d 457. The mere recital by the Commission that it has considered all of the factors prescribed by G.S. 62-133 in arriving at its ascertainment of "fair value" does not preclude the court from setting aside the finding of "fair value" where the record discloses any of the above mentioned errors of law. *Utilities Commission v. Public Service Co., supra.*

[39] It seems inescapable that the Commission cannot "consider" or "weigh" an element until it first determines what that element, itself, is. No doubt, the Commission, in the present case, formed an opinion satisfactory to itself, as to the amount of the "replacement cost," depreciated, of the properties included in its determination of the "reasonable original cost," since it said it had given consideration thereto. Unfortunately, though it set forth its finding of the "net investment" [i.e., the reasonable original cost, less depreciation], it failed to set forth its finding of the "replacement cost," depreciated. We do not construe this omission as an acceptance by the Commission of Mr. McGrath's conclusion, for, as we have indicated above, his conclusion was predicated, in substantial part, upon certain items the Commission excluded from "net investment," and upon an erroneous treatment of depreciation. While the consideration or weight to be given "replacement cost," depreciated, in ascertaining "fair value" rests in the sound discretion of the Commission, the reviewing court cannot satisfactorily determine whether the Commission considered or weighed this element at all, or merely gave it "minimal consideration," unless the Commission sets forth what it found this element to be. Though perhaps not indispensable to the validity of such find-

ing, it would be proper, and certainly helpful to the reviewing court and to the parties, for the Commission to state, at least in summary, its reasons for not acquiescing in the figures suggested for this element by the respective expert witnesses.

[40]    Original cost, less depreciation, and replacement cost, less depreciation, are not ultimate facts but evidential facts only. The ultimate fact, in this segment of a rate case, is "fair value." However, G.S. 62-133 requires that these evidential facts be considered or weighed by the Commission in determining this ultimate fact. This is not to say that in no case may the Commission fix rates to be charged by a utility for its service without a determination of "replacement cost," less depreciation. The utility, with the Commission's acquiescence, may offer evidence of original cost less depreciation, as its only evidence of "fair value." Proof of "replacement cost" is exceedingly costly, and may be unduly burdensome, especially to a small utility company. However, where, as here, such evidence is introduced, the statute seems clearly to require that the Commission make, and set forth in its order, its findings as to both of these evidential facts, along with any "other facts" considered by it. G.S. 62-79 requires that all orders of the Commission shall include findings upon all "material issues of fact, law, or discretion presented in the record." *Utilities Commission v. Membership Corp.,* 260 N.C. 59, 64, 131 S.E. 2d 865; *Smith v. Illinois Bell Telephone Co.,* 282 U.S. 133, 152, 51 S.Ct. 65, 75 L.Ed. 255; *Northern States Power Co. v. Board of Railroad Commissioners,* 71 N.D. 1, 298 N.W. 423; *Commonwealth Telephone Co. v. Public Service Commission,* 252 Wis. 481, 32 N.W. 2d 247.

[41, 42]    We hold, therefore, that, when the record before the Commission presents the questions of the original cost, less depreciation, and the replacement cost, less depreciation, these are "material issues of fact," upon each of which the Commission must make its finding. When it does so, those findings are conclusive, if supported by substantial evidence in the record and not affected by an error of law. Having made such findings, so supported, it is for the Commission, not the reviewing court, to determine, in its expert discretion and by the use of "balanced scales," the relative weights to be given these several factors in ascertaining the ultimate fact of "fair value." *Utilities Commission v. Gas Co.,* 254 N.C. 536, 550, 119 S.E. 2d 469. It is, of course, the prerogative of the Commission to determine

the credibility of evidence, even though it be uncontradicted. It is clearly the prerogative of the Commission to take into account, in making its finding of replacement cost, errors or omissions in the testimony of an expert witness purporting to show such replacement cost.

[43] It must be borne in mind that the ultimate fact to be found is the present "fair value" of the properties. Obviously, the present "fair value" of a plant, physically new, but composed of outmoded, obsolete equipment, poorly designed and engineered, cannot exceed what it would cost to build today a modern, well engineered and designed plant capable of producing the same quantity of service at lower operational costs. See the dissenting opinion of Justice Brandeis, concurred in by Justices Holmes and Stone, in *St. Louis & O'Fallon Railway Co. v. United States,* 279 U.S. 461, 488, 517, 49 S.Ct. 384, 73 L.Ed. 798, and the authorities there cited. Consequently, the Commission is not required to accept as a factor to be weighed, in determining "fair value," the full amount stated by an expert witness to be the cost of reproducing the exact plant now in operation, brick for brick, pole for pole, and wire for wire.

[44] It is obvious that consistently poor service, attributable to defective or inadequate or poorly designed equipment or construction, justifies a subtraction from both the original cost and the reproduction cost of the existing plant before weighing these factors in ascertaining the present "fair value" of the properties. *City of Alton v. Illinois Commerce Commission,* 19 Ill. 2d 76, 165 N.E. 2d 513, 518. The Commission must, however, make a specific finding showing the effect it gave this relevant factor, if it made such deduction on that account. *Utilities Commission v. Morgan, Attorney General, supra,* at pp. 268-269. As the Supreme Court of Appeals of Virginia said, in *Alexandria Water Co. v. City Council of Alexandria,* 163 Va. 512, 563, 177 S.E. 454: "The fact that a plant or a unit thereof is not well adapted to, or is inappropriate for, its present and/or reasonably to be anticipated future use tends materially to reduce its value below its reproduction new cost. One of the forms of inappropriateness is inappropriate engineering layout."

G.S. 62-133 recognizes the self-evident truth that the present "fair value" of a utility plant, which includes properties installed at varying times over a period of many years, is not

to be ascertained by simply weighing the original cost new and the replacement cost new. From each of these there must be subtracted an appropriate allowance for depreciation in order to reach the elements which are to be considered in arriving at the ultimate fact of present "fair value." In this era of automation and a well nigh constant flow of inventions and new techniques, the art of telephony is rapidly changing. Obsolescence often takes a heavier toll from the value of plant and equipment than does physical wear and tear.

Before there is any return whatever to the utility upon the "fair value" of its properties, it must recover its operating expenses, including an adequate allowance for the depreciation or consumption of its properties in the public service. *Utilities Commission v. Morgan, Attorney General, supra,* at p. 262. Rates for service are fixed by the Commission on the basis of including, as an operating expense, an annual charge for depreciation, which over the anticipated useful life of the property will, upon its retirement from service, be sufficient in amount to restore to the utility the full original cost of the property. G.S. 62-35; *Utilities Commission v. State* and *Utilities Commission v. Telegraph Co., supra,* at p. 346. The Commission is expressly authorized to prescribe "what are proper and adequate charges for depreciation of the several classes of property for each public utility," and to make such changes from time to time in these as it finds necessary. G.S. 62-35(c).

General's charges to operating expenses for depreciation, so approved by the Commission, are computed on the straight line basis, the most frequently used of several methods for computing annual depreciation charges. Substantially, this method involves (1) estimating the service life of the various properties included in the plant, (2) estimating the salvage value of such property at the end of its useful service life, (3) dividing the original cost of the property, less its salvage value, by the number of years of its anticipated service life, and (4) charging annually to operating costs, and setting aside in a reserve for depreciation, an amount equal to such quotient. The reserve so created is customarily reinvested in the business.

[45] If these estimates and computations are correct, at any given time during the service life of the property, the reserve will be in the same proportion to the original cost as the consumed portion of the property is to the total property new.

Utilities Comm. v. Telephone Co.

Obviously, as to any specific item of property, this exact relation of accumulated reserve to accumulated actual depreciation at any given time is unlikely, since properties do not wear out or become obsolete at a uniform rate. Nevertheless, when this method is applied to the innumerable items constituting a utility plant, these having been installed in service at varying times over a period of years, a reasonably close relationship between the reserve and the actual accumulated depreciation is probable. If such relationship is not present, then the Commission, in fairness both to the utility and to its ratepayers, may and should review, and make appropriate changes in, the annual charge to operating expenses on account of depreciation. In *State v. Hampton Water Works Co.*, 91 N.H. 278, 18 A. 2d 765, 774, the Supreme Court of New Hampshire, speaking through Chief Justice Allen, said: "It would seem that the company's actual depreciation reserve, found by the Commission to be adequate and proper, should be applied in proportion to reproduction costs." See also: *Tobacco River Power Co. v. Public Service Commission*, 109 Mont. 521, 98 P. 2d 886; *City of Philadelphia v. Pennsylvania Public Utility Commission*, 174 Pa. Super. Ct. 641, 102 A. 2d 428.

In *Lindheimer v. Illinois Bell Telephone Co.*, 292 U.S. 151, 167, 54 S.Ct. 658, 78 L.Ed. 1182, Chief Justice Hughes, speaking for the Court, said:

"Broadly speaking, depreciation is the loss, not restored by current maintenance, which is due to all the factors causing the ultimate retirement of the property. These factors embrace wear and tear, decay, *inadequacy,* and *obsolescence.*" (Emphasis added.)

To the same effect are: *Utilities Commission v. State* and *Utilities Commission v. Telegraph Co.*, 239 N.C. 333, 346, 80 S.E. 2d 133; *City of Cincinnati v. Public Utilities Commission*, 151 Ohio St. 353, 86 N.E. 2d 10; *Solar Electric Co. v. Pennsylvania Public Utilities Commission*, 137 Pa. Super. Ct. 325, 9 A. 2d 447; *Chambersburg Gas Co. v. Public Service Commission*, 116 Pa. Super. Ct. 196, 176 A. 794, 797; *Wisconsin Telephone Co. v. Public Service Commission*, 232 Wis. 274, 337-338, 287 N.W. 122. An expert witness, who computes replacement cost by trending the original cost of the properties and subtracting from the figure, thus derived, an allowance for no element of depreciation, save the physical wear and tear observed by him,

has obviously left out the major factor of obsolescence. The Commission is not required by the statute to accept as the replacement cost factor, in its ascertainment of "fair value," such a witness' conclusion, even though there be no other witness on the subject of replacement cost.

A utility, nothing else appearing, occupies a poor position before the Commission when, in the same rate case, it says, through one witness, that it should be permitted to continue to charge, as an annual operating expense, the company's long established and applied depreciation rates, but says, through another witness, the reserve, thus accumulated, does not reflect the portion of its properties heretofore consumed through use and obsolescence.

[46] As the Wisconsin Court has said: "Manifestly, property does not diminish in value in accordance with a regular schedule. * * * Some new invention may require the retirement of a large amount of property, such as the substitution of the dial for the manual system. * * * It is also apparent that some depreciation factors are not observable from physical inspection." *Wisconsin Telephone Co. v. Public Service Commission*, 232 Wis. 274, 337-338, 287 N.W. 122. Professor Bonbright has said in his book, "Principles of Public Utility Rates," at p. 98: "As a matter of sound accounting and sound price fixing, the rates at which capital costs are gradually transformed into a series of charges to operating expense should be based on plausible assumptions as to downward trends in asset values in the course of their service lives." In the absence of convincing evidence to the contrary, the Commission is entitled to proceed on the assumption that the annual charges to operating expenses to cover depreciation, which the company has been making with the Commission's approval, have been so based. See also, *City of Weslaco v. General Telephone Co. of the Southwest* (Tex. Civ. App.), 359 S.W. 2d 260, 265, and *Re Reedsburg Telephone Co.,* 7 P.U.R. (N.S.) 389, 397, in which case the Wisconsin Public Service Commission said:

"[Witness] Hartt's depreciation estimate is based on inspection of portions of the property. This method, as applied by Hartt, gives consideration to the physical causes of depreciation, but does not provide a complete allowance for the more or less invisible but extremely important causes of depreciation such an inadequacy and obsolescence.

For the past seventeen years this utility has followed the 'straight-line' method of depreciation accounting. This method supposedly makes allowance for all factors both physical and functional which act to terminate the service lives of units of equipment. In our opinion, a utility which claims and has long used the 'straight-line' depreciation allowances in operating expenses for the ostensible purpose of replacing capital consumed in operation is estopped to have its property for purposes of valuation depreciated on some other and inconsistent basis. Either the company was wrong in claiming its depreciation expense or it is wrong now in claiming accrued depreciation on a different basis. It cannot be right in both respects."

[47] Where, as in the present case, the accumulated reserve indicates a total accumulated depreciation of 17%, in absence of convincing evidence to the contrary, the Commission may discount the replacement cost new by 17% in arriving at the replacement cost factor which it is to consider and weigh in determining the "fair value" of the properties. If there is evidence to support such a finding, the Commission may, instead, discount replacement cost new by a greater or a smaller amount on account of depreciation, including obsolescence. Here, as in other phases of a proceeding instituted by the utility to fix its rates for service, the burden of proof is upon the utility. G.S. 62-75.

The Commission may, after proper findings, further subtract from both original cost new and replacement cost new an appropriate allowance for the inadequacy of the plant, if any, indicated by the great volume of service complaints set forth in the evidence before the Commission.

[47, 48] We, therefore, hold that the Court of Appeals was correct in its conclusion that the Commission committed an error of law, in failing, in the present case, to make a specific finding of its determination of the replacement cost of General's properties. Upon remand the Commission may, in making such finding, take into account the appropriate allowance for depreciation, including obsolescence, and the appropriate allowance for inadequacy, if any, of the properties due to faulty engineering, faulty maintenance or other circumstance. The Commission should make appropriate findings as to these items. It may further subtract from original cost and from replace-

ment cost, so adjusted, the appropriate amount for excess plant margins hereinabove discussed.

### Plant Under Construction At The End Of The Test Period

[49] The Court of Appeals was correct in finding no error in the Commission's refusal to include in the rate base telephone plant under construction at the end of the test period. This is not property "used and useful" within the meaning of G.S. 62-133. *State v. Morgan, Attorney General, supra,* at p. 273; same case on rehearing, 278 N.C. 235, 179 S.E. 2d 419.

### Fair Rate Of Return

General's witness, Mr. Redman, testified that, as of the end of the test period, General did not have enough coverage of interest charges by earnings to permit the issuance of additional long term debt securities under the terms of its indenture. "This," he said, "is true for our entire operation, not just for North Carolina."

Mr. Redman's testimony and exhibits do not disclose directly how General's earning rate on its North Carolina intrastate business compares with that in each of the other states in which General operates. However, it does appear from Mr. Redman's Exhibits 13 and 14 that in the test period General's net operating income from North Carolina intrastate service was 28.8% of its company-wide net operating income, whereas it appears from his Exhibits 12 and 15 that General's net investment in telephone plant attributable to North Carolina intrastate service was only 18.8% of its company-wide net investment in telephone plant. These exhibits appear to indicate that such inadequacy as there may be in the coverage of interest charges by earnings stems, primarily, from General's operations in other states rather than from its North Carolina intrastate service. "North Carolina users of telephones are not to be required to furnish revenue to maintain applicant's financial condition which other states refuse to provide." Justice Barnhill, later Chief Justice, in *Utilities Commission v. State* and *Utilities Commission v. Telegraph Co., supra,* at p. 346.

Furthermore, Mr. Redman's testimony in this regard was predicated upon the inclusion in General's long term debt of an issue of $14,000,000 in new bonds on the day after the test period ended, the interest rate on that issue being 9.375%. That bond issue would, necessarily, depress temporarily the ratio of

earnings to interest charges. Clearly, the ratio maintained during the test period was sufficient to permit the sale of the bond issue of 1 April 1970.

According to Mr. Redman, General's current construction program requires the attraction of a substantial amount of capital, in addition to funds available through the accumulation of its reserve for depreciation. In his opinion, to secure long term debt capital for such construction, General must have earnings, after taxes, equal to two times its interest charges and it would have such earnings from North Carolina intrastate service, in relation to interest charges attributable to that service, if the requested rate increases were granted in full.

Mr. Meyer, Vice President of GT&E, was General's expert witness on what constitutes a fair rate of return, being permitted to testify as an expert in that field over objection by the city. The substance of his voluminous testimony and exhibits is as follows:

The optimum capital structure for General is: 45.09% mortgage bonds; 3.00% debentures; 0.02% other long term debt; 5.56% short term debt; 1.93% unamortized tax credit; 2.25% preferred stock; and 42.15% common equity (i.e., common stock plus accumulated surplus). A fair rate of return to General is a composite of the cost of the debt and preferred stock components of such capital structure, plus a reasonable return on the equity component. He computed the cost of the bonded debt component by considering the present embedded cost of outstanding bonds, prior to the issue of 1 April 1970, which is 5.76%, the cost of that issue, which is 9.63%, and his opinion as to the cost at which a proposed issue of $6,600,000 could be sold at the time of the hearing, 8%. From these factors, he derived a composite cost of the bonded debt component, 6.73%.

Proceeding with his computation of the composite cost of capital to General, Mr. Meyer used the present embedded cost of the debenture component, 4.85%, and of the other long term debt component, 6%. For the short term debt component, he used the cost of short term debt as of the time of his testimony, 6%, and for the preferred stock component, he used the actual dividend rate of 4.65%. To the "unamortized investment tax credit" component, Mr. Meyer assigned a cost rate of 3%, although this is capital which is available to General without

any actual interest cost whatsoever. This left for determination his estimate of the cost of the common equity component of the capital structure.

In Mr. Meyer's opinion, the basic test of a fair rate of return on the common equity component of a utility's capital structure is "the comparable earnings test." Since a public utility has no right to a profit such as is anticipated in a highly profitable, speculative venture, he restricted his study of earnings of other companies to "comparable utilities," both telephone and electric, also taking into account the coverage of interest charges by earnings required to give General an A rating on its bonds. His conclusion was that a reasonable return to General on the equity component of its capital structure was between 11.5% and 13.5%. Considering all components in combination, he concluded that "a fair range of rate of return * * * on the rate base" would be 8.5% to 9.5%.

In the opinion of Mr. Meyer, the common equity component of General's actual capital structure as of the end of the test period, 36.03%, was too low and would tend to increase the cost of the debt component of his optimum capital structure. In this observation, however, he did not take into account any increase in the equity component, for rate making purposes, by reason of the unrealized paper profit inherent in a finding of "fair value" in excess of book value (original cost less depreciation).

General's witnesses, Mr. Flannery and Mr. Duncan, both testifying for the primary purpose of showing the reasonableness of the profits earned by Automatic on its sales to General, demonstrated, rather convincingly, that the earnings of industrial corporations are little, if any, evidence of what rate a utility should be permitted to earn on the "fair value" of its properties.

Mr. Flannery testified that a manufacturing company has "a risk factor far greater than a public utility," and for this reason successful manufacturing companies ordinarily earn greater returns than do public utilities. His testimony as to the reasons for this may be summarized as follows: Manufacturers' sales tend to change dramatically from year to year, whereas public utilities have a reasonably stable growth in their rates of return. The cost of operation of a manufacturing company, as contrasted with a utility, is greatly increased by the much

more erratic fluctuations in revenues. The cost of labor and material to the manufacturing company is a much higher proportion of its revenue dollar than is the case with the utility.

Mr. Duncan's testimony upon this subject may be summarized as follows: It is difficult to draw any meaningful comparison of returns on investment between industrial companies without careful analysis of their comparability. This is especially true where the comparison is between a particular company and broad averages of rates of earnings shown by a number of companies in diverse industries. "Unlike most utility companies, return on investment on any one of the industrial companies included in the average can fluctuate widely, depending on many different factors. * * * Secondly, there is no uniform system of accounts such as is prescribed for utilities. * * * Return on book net worth is a relatively unimportant measure of the profitability of an industrial business because the balance sheet usually does not reflect any amount for some of the company's most productive assets." The profitability of a manufacturing enterprise is less dependent on tangible assets than on such intangibles as the competency of its management, the creativity of its research, its patents, processes and technical drawings, the reputation of its product, the skill of its labor force and other intangibles which do not appear on the balance sheet.

The city's witness, Dr. Olson, also used the cost of capital approach as the basis for his computation of a fair rate of return for General. Including the bond issue of 1 April 1970, he computed the weighted cost of outstanding mortgage bonds at 6.476%, as contrasted with Mr. Meyer's computation of 6.73%. Dr. Olson based his computation of a fair return on the equity component of General's capital structure upon a study of the ratios of earnings per share to market price per share of companies deemed by him comparable to General. His conclusion was that a return of 9.8% on its equity component would be sufficient to attract equity capital to General and so would be a fair return on its equity component. This contrasts with the range of 11.5% to 13.5% used by Mr. Meyer in his computation of the cost of equity capital to General. Like Mr. Meyer, Dr. Olson did not take into account in his computation any addition to General's equity component by reason of the unrealized paper profit inherent in a "fair value" rate base which is in excess of the original cost less depreciation.

Dr. Olson further testified: "The company [General] has included in its operating costs the higher taxes it would have paid without the investment tax credit, and this excess has been accumulated as an investment tax credit reserve. This reserve represents capital that has been accumulated by charging telephone subscribers more for Federal income taxes than the company actually has paid. The company pays no return on this capital and it should be deducted in arriving at the rate base upon which the company is entitled to earn a return." The North Carolina intrastate portion of this accumulated reserve is $690,030.

Plant and equipment acquired with past excess allowances in the rate structure for operating expenses is, nevertheless, property of the utility. It is properly included in the rate base. G.S. 62-133(b). The appropriateness of continuing to allow, as an operating expense, a computation of income tax liability in excess of taxes actually payable is a different matter. The consideration of time lags between collections of customers' bills and payment of taxes and other expenses in computing the utility's need for cash working capital is also a different matter.

[50] G.S. 62-133(b) (4) requires the Commission to fix a rate of return on the "fair value" of the properties which will enable the utility "by sound management": (1) To produce a fair profit for its stockholders, in view of current economic conditions, (2) maintain its facilities and service, and (3) compete in the market for capital. This, as is recognized by all parties before us, is the test of a fair rate of return declared in *Bluefield Water Works & Improvement Co. v. Public Service Commission, supra,* at p. 692. See also, *Federal Power Commission v. Hope Natural Gas Co., supra,* at p. 603. The fixing of rates for service which will enable the utility to do these things, and no more, is the ultimate objective of rate making. At best, the result of the complex rate making procedure is an approximation of this objective. *Utilities Commission v. State* and *Utilities Commission v. Telegraph Co., supra,* at p. 344.

The apparent precision with which experts, both for the utility and for the protestants, compute the fair rate of return is somewhat illusory. The habitual bickering and theorizing of such witnesses over the relative merits of methods of computing cost of equity capital, such as the earnings-to-price ratio

or the discounted-cash-flow, lends a false appearance of certainty to the ultimate decision which is for the Commission. No doubt, either of these, or any other method adopted by a competent expert, will aid the witness and the Commission in arriving at an approximation of the return, which will be sufficient to attract to the utility the capital it will require in the *immediate future.*

[51]  It is for the Commission, not the reviewing court, to determine the credibility of and the weight to be given to all competent evidence, including conflicting expert opinion testimony upon this complex question and the respective methods used by the witnesses in their studies. As Chief Justice Hughes said, in *Lindheimer v. Illinois Bell Telephone Co., supra,* at pp. 163-164, the actual experience of a utility in the attraction of capital, under the rates of which it complains, is often more convincing than tabulations of experts and "[e]laborate calculations which are at war with realities are of no avail." See also, *Federal Power Commission v. Hope Natural Gas Co., supra,* at pp. 602-603. This is as true of the utility's experienced difficulty in attracting capital on reasonable terms as it is of the utility's success in doing so, which was the situation of which Chief Justice Hughes spoke in the Lindheimer case.

[52]  The weighing of the evidence and the drawing of the ultimate conclusion therefrom as to what return is necessary to enable a utility to attract capital is for the Commission, not the reviewing court. It has been said many times that this is so because the Commission is a body of experts "composed of men of special knowledge, observation and experience" in the field of rate regulation. *Utilities Commission v. Champion Papers, Inc.,* 259 N.C. 449, 456, 130 S.E. 2d 890; *Utilities Commission v. State* and *Utilities Commission v. Telegraph Co., supra,* at p. 349. Without any intent to question the correctness of such statement as to the experience and abilities of the Commission or to claim expertness for the courts, this is not the reason for the rule. The rule applies to the newly appointed, inexperienced commissioner, sitting on his first general rate case, as truly as it does to the veteran and, should the veteran be transferred from a seat on the Commission to a seat on the reviewing court, he loses immediately the preferential status given by this rule to his views of the matter. The reason for that status is not expertness in fact, but the circumstance that the Commission is the delegatee of the power of the Legislature.

The courts can modify or reverse the action of the Commission, in the exercise of that delegated authority, only when an error of law specified in G.S. 62-94 (including a violation of constitutional provisions) has occurred.

[53]    The Court of Appeals held it was such an error of law for the Commission to fix the allowable rate of return prior to its ascertainment of the "fair value" of General's properties used and useful in providing its telephone service. In this we find no error, in view of the rate making procedure required by G.S. 62-133 (b). In so holding, we do not intimate, as the Court of Appeals did not, that the Commission's determination that 7.53% is a fair rate of return upon the "fair value" of General's properties is arbitrary or capricious, or that it is unsupported by competent, material and substantial evidence in the record, or that it is confiscatory or, per se, in excess of the statutory authority of the Commission. Nor are we to be understood as holding that the Commission's finding of "fair value" is affected by any of these errors of law. What the Court of Appeals held was that, *without a finding* by the Commission of the replacement cost of General's properties "used and useful in providing the service," the Commission's *finding* of "fair value" was affected by an error of law and, consequently, its finding of a fair rate of return on such "fair value" was so affected and was premature.

[54]    Obviously, no witness, however expert, can form an opinion, prior to the hearing, as to the fair rate of return on the "fair value" of the utility's properties so used and useful, since there is, at that time, no way for the witness to know what the Commission will determine the "fair value" to be. Until that determination is made by the Commission, the existing capital structure of the utility, *for rate making purposes,* cannot be known. The capital structure of the company is a major factor in determining the risk of investing in its bonds or in its stock. Consequently, it is a major factor in determining its cost of capital, which cost determines the fair rate of return. See, *City of Alton v. Illinois Commerce Commission,* 19 Ill. 2d 76, 165 N.E. 2d 513, 519. To comply with the statute, the Commission must consider and weigh testimony of expert witnesses, on the question of the fair rate of return, in the light of its own adjustment, for rate making purposes, of the utility's actual capital structure by its determination of the "fair value" of its properties. Having done so, its determinations of the rate of return

to be allowed, and the rates for service it deems sufficient to earn such rate of return, may not be modified or reversed by a reviewing court in the absence of a violation of a provision of the State or Federal Constitution or of one or more of the other errors of law specified in G.S. 62-94(b).

### Other Assignments Of Error

[55-58]  The city's exception to the ruling of the Commission allowing Mr. Meyer to testify as to his opinion concerning the cost of capital and a fair rate of return cannot be sustained. *In Re Filing by Automobile Rate Office,* 278 N.C. 302, 320, 180 S.E. 2d 155. In view of our decision in that case, we cannot hold that, as a matter of law, the Commission erred in permitting such testimony by a witness experienced in public utility accounting and related financial matters. See also, Stansbury, North Carolina Evidence, 2d Ed, § 132. Of course, a witness qualified to testify as an expert in the field of his training and experience is not necessarily qualified to testify as an expert in other fields, even though somewhat related. *Hopkins v. Comer,* 240 N.C. 143, 81 S.E. 2d 369. However, the competency of a witness to testify as an expert is a question addressed primarily to the sound discretion of the trial court, or Commission, and its discretion is ordinarily not disturbed by a reviewing court. *LaVecchia v. Lank Bank,* 218 N.C. 35, 9 S.E. 2d 489. The fact that the witness is an officer or employee, or a consultant specially retained by a party to the litigation, does not disqualify him as an expert. The effect of this circumstance upon the weight to be given his opinion is for the trial body to determine.

We have considered each other assignment of error by each of the appellants and find therein nothing requiring discussion or further modification of the decision of the Court of Appeals.

The decision of the Court of Appeals, remanding this matter to the Utilities Commission for further proceedings by the Commission, either upon the record heretofore compiled at the hearing before it, or after such further hearing as it may deem advisable, is approved, except insofar as hereinabove modified. This matter is, therefore, remanded to the Court of Appeals, with direction that it enter its judgment remanding the matter to the Commission for further proceedings in accordance with this opinion.

Modified and affirmed.

Chief Justice BOBBITT, concurring in part, dissenting in part.

I concur in that portion of the Court's decision which holds that the Court of Appeals erred in affirming the deduction by the Commission of $978,000.00 from General's "net investment in plant" (original cost less depreciation) by reason of profits earned by Automatic upon its sales to General. With this exception, I vote to affirm the decision of the Court of Appeals for the reasons set forth in the opinion of Judge Parker. I deem it unnecessary to approve or disapprove the extended discussions in the Court's opinion relating to the determination of replacement cost, less depreciation, and other questions not directly presented by this appeal. These should be decided when drawn into focus by proper exceptions and full argument.

Justice HIGGINS, concurring in part, dissenting in part.

In my view the Court of Appeals committed error in confirming the Commission's deduction of $978,000 from the rate base on account of equipment purchased from a separate though affiliated corporate dealer. In my opinion, the evidence in the record neither justifies nor supports the deduction.

I vote to remand to the Utilities Commission for reconsideration and correction of this error. Otherwise I think the decision of the Court of Appeals is correct and should be affirmed.

Justice SHARP, concurring in part, dissenting in part.

I concur in the majority's decision that "the Court of Appeals erred in affirming the deduction by the Commission of $978,000 from General's 'net investment in plant' (orginal cost less depreciation) by reason of profits earned by Automatic upon its sales to General."

In all other respects I vote to affirm the decision of the Court of Appeals upon the grounds so succinctly stated by Judge Parker in the opinion of that Court. Thus, I dissent from the majority's decision that the Court of Appeals erred in setting aside the Commission's finding that General's investment in its North Carolina telephone plant should be reduced in the amount of $690,340 as "excess margin in central office equipment in re-

lation to the test period." In my judgment the Commission erred in making this deduction and this Court errs in affirming it.

In my view, the extended discussions and pronouncements in the majority opinion go far beyond the questions presented for decision on this appeal. The opinion is a dissertation upon the theory of rate making which clearly manifests the scholarship and indefatigability of the author. Yet, with all deference, I do not deem it the proper function of this Court, in any case, to attempt to encompass the law of future cases. Those will present facts and problems we cannot now anticipate, and the arguments which they engender may open avenues heretofore unexplored.